IN THE MATTER OF JOHN W. YENGO, CHARGED WITH CONTEMPT.

Superior Court of New Jersey
Appellate Division

Argued on January 29, 1979—Decided March 23, 1979.

Before Judges CONFORD, PRESSLER and KING.

*Mr. Raymond R. Wiss* argued the cause for appellant John W. Yengo, Esq. (*Mr. Seymour Margulies,* attorney).

*Ms. Erminie L. Conley,* Assistant Attorney General argued the cause for respondent State of New Jersey (*Mr. John J. Degnan,* Attorney General of New Jersey, attorney).

The opinion of the court was delivered by

PRESSLER, J. A. D. Appellant John Yengo, a member of the bar of this State, appeals from an order entered pur-

suant to *R.* 1:10–1 adjudging him in contempt *in facie curiae* and fining him $500. The conduct constituting the gravamen of the offense was his unexcused absence from court for a two-day period during a protracted criminal trial of multiple defendants, one of whom, Leo Leone, he represented.

The primary contention Yengo makes on this appeal is that the alleged offense, if an offense at all, was not a contempt "in the actual presence of the judge" subject to the summary disposition power of the judge contemned but rather constituted a contempt requiring prosecution and hearing by another judge pursuant to *R.* 1:10–2 and *R.* 1:10–4.

The relevant facts are essentially undisputed. An Essex County indictment, encaptioned *State v. Errico et al.*, charged ten defendants with participation in an illegal gaming operation and the conspiracies by which it was conceived and conducted. Trial was expected to be both lengthy and difficult, both because of the number of defendants and consequently the number of lawyers whose daily participation would be required and because of the complexity of the proofs, particularly those arising out of an extensive electronic surveillance. Accordingly, when the trial actually commenced on February 14, 1978 the judge advised all counsel that in order to complete the matter as expeditiously and fairly as possible their prompt and continuous attendance at trial was imperative. Counsel were clearly instructed to avoid any involvement in or commitment to any other matter during the duration of the *Errico* trial and to advise all other courts before whom any might have business of that engagement. The import of these instructions was again repeated from time to time as the trial progressed. There can be no question of Yengo's awareness of them, particularly in view of his request of the trial judge that he advise another trial judge before whom Yengo was scheduled to appear of this trial commitment.

The trial continued without interruption or incident until Thursday morning, March 2, 1978. Because of the making of various motions not involving Yengo's client, the actual trial before the jury did not resume until mid-morning. At that time Yengo's absence was noted. The trial judge inquired of Yengo's client, Leone, as to his knowledge of Yengo's whereabouts. Leone then stated that he was aware that Yengo was not intending to be in court but that he had arranged for another lawyer to be present in his stead. Several of the other defense counsel confirmed their understanding that Yengo himself would be absent. Shortly thereafter a young attorney, a Mr. Burns, arrived in the courtroom and advised the court that he was "covering" for Yengo. Leone agreed to the representation on the record, and trial resumed with the cross-examination of the State's witness who had monitored the wiretap and who, apparently, was the critical witness as to Leone's involvement in the conspiracy. Burns chose not to cross-examine him.

The trial judge was concerned that Burns' untoward decision not to cross-examine the monitor might seriously jeopardize Leone's interests. Having assumed that Yengo's absence was to be of brief duration, the judge then interrogated Burns as to Yengo's whereabouts with the intention of requiring his immediate appearance. It was at that point that the trial judge was first made aware of the fact that Yengo had left the country the night before, was not due back until the following Monday and, despite Burns' general inexperience and his basic unfamiliarity with the case, had asked him to appear for him both that day and the next. The judge's concern for the integrity of Leone's trial was further compounded by the fact that on the following day a State's expert was scheduled to testify as to opinions based on facts adduced during the eight preceding trial days. The judge himself then undertook an investigation of Yengo's whereabouts, culminating in a telephone conversation with Yengo's daughter who advised that Yengo had gone on a four-day vacation to Bermuda and would return

on Sunday evening, and that she did not know where in Bermuda he could be reached. The judge then directed that the expert's testimony would have to await Yengo's return. On Monday, March 6, 1978, Yengo appeared in the courtroom and told the judge that he had had to attend to a business matter in Bermuda and had not felt, in view of his arrangement with Burns, that it was necessary to advise the court of his projected absence. The contempt citation followed, the judge concluded that

> The action of John Yengo, Esq., in going to Bermuda for two court days in the third week of a five-week, complex wiretap gambling conspiracy case with ten defendants and a seventeen-member jury without prior notice and approval of the court and without leaving word as to where he could be reached, constituted a disruption in the Court proceedings, disobedience of the court order prohibiting involvement in other proceedings, a lack of respect for the Court, a lack of professional responsibility, as well as conduct prejudicial to the administration of justice.

We concur completely with the trial judge's assessment of Yengo's conduct and we have no doubt that it was indisputably and egregiously contumacious. We nevertheless are constrained to reverse the contempt citation because we are of the view, for the reasons hereinafter expressed, that an attorney's absence does not constitute a contempt *in facie curiae* and hence that an alleged contempt based on that charge must be prosecuted pursuant to *R.* 1:10-2 and *R.* 1:10-4. We are also constrained to recognize that contempt is a criminal offense. The fact that certain categories of contempt are susceptible to summary disposition does not mean that those categories are also susceptible to directed verdicts of guilt. We would be tempted, as an alternative to reversal, to exercise our *de novo* jurisdiction and to make an independent finding of guilt were we not, in our view, constitutionally restrained from so doing.

We recognize that the law is well settled both in this jurisdiction and uniformly throughout this country that an attorney's absence from a courtroom in which he has a duty

to appear before a judge to participate in a scheduled proceeding in which he is counsel for a party constitutes a contempt of that court if his absence is without valid or reasonable excuse grounded in inability or incapacity. See *In re Clawans,* 69 *N. J. Super.* 373 (App. Div. 1961), certif. den. 36 *N. J.* 296 (1962), *cert.* den. 370 *U. S.* 905, 82 *S. Ct.* 1250, 8 *L. Ed.* 2d 401 (1962). And see Annotation "Attorney — Court Attendance — Contempt," 97 *A. L. R.* 2d 431 (1964), and supplementary service thereto. The point is that it is not merely the absence which constitutes the contempt. It is rather a willful absence, that is, an absence without just excuse, which constitutes the offense. Thus, it is clear that before the absence can be adjudged to be contumacious there must be a finding of fact as to the reason therefor. The necessity, however, for a prerequisite finding to be made as to circumstances not themselves occurring in the courtroom results, by definition, in the contempt, if there is one, not having been committed *in facie curiae.*

The reason for the foregoing conclusion is evident. As the New Jersey Supreme Court made clear in *In re Contempt of Carton,* 48 *N. J.* 9, 21 (1966), the power of the court to deal with a direct contempt immediately and summarily is based upon the concurrence of two distinct considerations. The first is that the conduct itself is an affront or an impediment to the proper administration of the proceeding, which must be dealt with forthwith "to support the judge's control of the courtroom." The second is that the conduct is known to the judge "by his own senses" and, therefore, "he need not adduce the proof of the wrong, but may merely certify the facts he witnessed in the order of conviction." The first of these may or may not obtain when an attorney is absent. The second, however, cannot obtain until there has been proof adduced as to the reason for the absence. Thus, it cannot be said that all of the elements of the offense are perceivable by the judge by his own senses. The offense, therefore, cannot be a direct contempt within the con-

templation of *R.* 1:10–1, but rather constitutes an indirect contempt, subject to the procedural prescriptions of *R.* 1:10–2 to 4, *inclusive.*

We reject the minority view which holds that an absence without valid excuse may be deemed to be a direct contempt. See, *e. g., Chula v. Superior Court,* 57 *Cal.* 2d 199, 18 *Cal. Rptr.* 507, 368 *P.* 2d 107 (Sup. Ct. 1962) (Traynor, J., Peters and Dooling, J. J., dissenting). We are persuaded by the logic of Justice Traynor's dissent in *Chula* and his observation that

> In stating that "The failure of an attorney, *without valid excuse,* to be present * * * constitutes * * * a direct contempt" (italics added), the majority opinion itself implicitly concedes that petitioner's contempt, if any, cannôt be subject to summary punishment. The absence of a valid excuse is an indispensable element of the contempt. The trial judge could not discover the nature of the excuse or determine its validity without a hearing. [18 *Cal. Rptr.* at 513, 368 *P.* 2d at 113]

We do not regard *In re Clawans, supra,* relied on by the State, as contrary to our holding here. While it is true that we there affirmed a conviction of a direct contempt where an attorney failed to appear in court as scheduled, the substance of the contempt there was not merely the absence but also the attorney's refusal to offer an explanation for her absence when she finally did arrive, her continued refusal to proceed with the scheduled matter, and her refusal to give a reason for that refusal.

We are also persuaded that considerations of public policy mandate the result here. The bench and the bar perform very different functions in our justice system, and the differences in their respective obligations, perspectives and orientations produce inevitable tension between them. We accept and accommodate to that tension in its ordinary occurrence as a fundamental predicate of the adversary system. But we do so with the recognition that a free and independent bar, because it is at the very core of that system, must be protected

from the arbitrary use of power by the bench. We do not at all intend to suggest that the exercise of judicial power here was arbitrary. Our concern rather is directed towards a precedential use of judicial power in circumstances both amenable to and calling for vindication on notice, prosecution and hearing before a different judge. In view of our reversal we need not consider Yengo's remaining challenges to the contempt conviction.

The contempt conviction is reversed. We remand to the trial court for such further proceedings as it may deem it appropriate to institute.