IN THE MATTER OF JOHN W. YENGO, ESQ., CHARGED
WITH CONTEMPT.

Argued December 11, 1979—Decided August 4, 1980.

*Erminie L. Conley*, Assistant Attorney General, argued the cause for appellant State of New Jersey (*John J. Degnan*, Attorney General of New Jersey, attorney).

*Raymond R. Wiss* argued the cause for respondent John W. Yengo, Esq. (*Seymour Margulies*, attorney).

The opinion of the Court was delivered by

POLLOCK, J.

The primary issue on this appeal is whether the unexcused absence of an attorney from a trial constitutes contempt in the presence of the court justifying summary disposition under *R.* 1:10–1.

The trial judge concluded that the absence of the attorney constituted direct contempt in the presence of the court and

disobedience of a court order prohibiting involvement in other proceedings. She found him guilty of contempt and imposed a $500 fine. The Appellate Division reversed and remanded, concluding that the offense was an indirect contempt requiring notice and hearing in accordance with *R.* 1:10–2 to 4. 167 *N.J.Super.* 66 (1979). We granted certification. 81 *N.J.* 333 (1979). We now reverse the judgment of the Appellate Division and reinstate the judgment of conviction entered by the trial court.

## I

Respondent, John W. Yengo, represented Leo Leone, one of ten defendants in a multiple defendant gambling conspiracy trial. The nature of the case, the number of defendants and their counsel, together with the complexity of the evidence, presented difficult trial problems. The intricate proofs, which included wiretaps or monitored telephone conversations by court-authorized electronic surveillance, made attorney attendance throughout the trial a matter of highest priority. Both court and counsel recognized the special problems inherent in the management of the case. For example, 18, rather than 12, jurors were impaneled. The trial was estimated to last for five weeks. Those difficulties were compounded by an influenza epidemic and a major snowstorm. Because of bad weather, the scheduled trial date was postponed three times.

Anticipating scheduling difficulties among the numerous defense attorneys, the judge stressed the need for regular attendance. She instructed counsel that she would not tolerate tardiness or absence without her prior approval. On February 8, 1978, she pointedly advised counsel:

> Now you are considered on trial before me . . . . [Y]ou are to advise all other courts and all other judges that you are on trial before me. If you have any problem with any judge, you let me know . . . . . So, don't get involved in any other case or trial . . . . .

On February 14, the judge again emphasized the importance of punctuality:

> Now, I just want to advise you that it is my intention to move this case along as rapidly as I can. The case itself has enough problems involved with the law

involved in it without us having practical problems on a day-to-day basis with regard to time and otherwise . . . .

However, I am putting you all on notice that I intend, once we get going with this case, to abide by the time restrictions on this case. All of you have got to be here at 9 o'clock because I am going to be out on the bench at 9 o'clock. I intend to impose sanctions on any attorney who is not here on time. The Assignment Judge of Essex County comes from Jersey City and Hudson County and if he can get here by 8:15 in the morning, you people can get here on time.

So, all of you get yourselves here on time as we move throughout the case, and I am just giving you notice, that there will be sanctions including considerations of the cost of the inconvenience of jurors, the costs of the court staff being here, the inconvenience to all the other attorneys involved in the case, problems relating to delay of witnesses and such.

As for your clients, most .of them are here. I want to advise all of you that you are all to make appropriate arrangements to get yourselves here on time. I intend to proceed with the case and move along with the case in accordance with the time restrictions and if you are not here, I will consider you to have voluntarily absented yourself.

So, what I am asking from you is your cooperation in telling you I am going to give you every consideration I can under the circumstances, but because of the nature of the case, the number of attorneys, the number of defendants, we have to be strict with regard to the time requirements. I intend to impose those and if they are violated, I will impose sanctions.

Yengo was not only aware of the instructions, but on February 22 he requested Judge Loftus to call another judge before whom he had a matter pending.

Testimony began on February 21, and Yengo appeared regularly until March 2. On that date, without previously informing the judge, he failed to appear at trial. Although Yengo failed to notify the court of his planned absence, he had discussed the matter with the prosecutor, several of the other defense attorneys and his client. In his place, Lawrence Burns, an attorney admitted to practice in 1975, appeared on behalf of Leone. Burns shared office space with Yengo, received cases from him, and described himself as Yengo's associate. Burns arrived late for the trial.

Leone advised the court that he consented to representation by Burns in Yengo's absence. Earlier Leone had consented to representation by Kenneth R. Claudat, another defense attorney, to "protect his interest" until Burns arrived.

The trial judge acknowledged Burns' authorization to represent Leone, and heard testimony of the State's wiretap moni-

tor witness until lunchtime. Following the initial hour of testimony, Judge Loftus became concerned about the extent of Burns' knowledge of the case. During the lunchtime recess, the judge questioned Burns in her chambers about Yengo's absence. Burns stated he did not know why Yengo had failed to obtain court approval for his absence, why he was absent, or where he had gone.

In response to questions from the court, Burns informed the judge that Yengo had called Burns at 9 o'clock the preceding evening to advise that he was going out of the country. Burns stated further that he had reviewed the file with Yengo for 15 minutes at 11:00 p. m. on that evening and that previously he had spent two days reviewing the file and discussing it with Yengo.

The trial proceeded with Burns acting as counsel for Leone. Judge Loftus tried several times to locate Yengo through calls placed by her secretary to his answering service. Judge Loftus also called Yengo's home and spoke with his daughter, who told the judge that Yengo had gone to Bermuda on a four day vacation and would return on Sunday, March 5. However, the daughter was unable to inform the court where Yengo was staying in Bermuda.

The trial court concluded that she had no alternative but to let the trial continue. The other attorneys stated that the testimony that would be adduced during Yengo's absence would not relate to Leone. Although the court expressed concern that an expert witness for the State might testify before Yengo returned, the trial continued uninterrupted through Friday, March 3.

The judge did not issue a citation for contempt on March 2 or March 3, the days on which Yengo was absent. Instead, she sent a telegram to his home ordering and directing him to appear before her at 9:00 a. m. on Monday, March 6, 1978, the next trial date.

On that date, Yengo appeared in court. · The trial judge cleared the courtroom, except for court personnel and Yengo.

He explained that he had been in Bermuda on business for a supermarket. He stated that he did not communicate with the court because he did not know if he would be going to Bermuda until late Wednesday, March 1. He also explained that, as a matter of trial strategy, he had decided not to cross-examine the monitor witness from the State.

In the course of the colloquy with the court, the trial judge stated:

> I called you here this morning and gave you the opportunity to speak because I thought that maybe the information that had come to my attention by the various phone calls I had to make, that you had gone to Bermuda for the weekend, was wrong. I thought maybe there was even some kind of explanation for it . . . but that is not so. There is absolutely no emergent necessity for you to leave this Country and go to Bermuda. Your actions just bespeak nothing but irresponsible professional conduct toward your client and towards this court.

She then cited him for contempt in the presence of the court and stated he would be "dealt with further at another time with regard to the disposition of this particular citation."

On April 14, 1978, Yengo appeared before Judge Loftus. She affirmed the determination of contempt and imposed a fine of $500. In her certification on April 21, 1978, the trial court stated:

> The action of John Yengo, Esq., in going to Bermuda for two court days in the third week of a five-week, complex wiretap gambling conspiracy case with ten defendants and a seventeen-member jury without prior notice and approval of the Court and without leaving word as to where he could be reached, constituted a disruption in the Court proceedings, disobedience of the Court order prohibiting involvement in other proceedings, a lack of respect for the Court, a lack of professional responsibility, as well as conduct prejudicial to the administration of justice.

The certification concluded by stating that Yengo was adjudged guilty of contempt in the presence of the court on March 6, 1978. *See R.* 1:10–1.

## II

The law of contempt is derived from statutes, rules of court, and judicial decisions. In general, contempt includes disobedience of a court order or misbehavior in the presence of the court by any person or misbehavior by an officer of the

court in his official transactions. *N.J.S.A.* 2A:10–1. The essence of the offense is defiance of public authority. *In re Contempt of Carton,* 48 *N.J.* 9, 20 (1966); *N.J. Dept. of Health v. Roselle,* 34 *N.J.* 331, 337–338 (1961).

■ A defendant is entitled to certain safeguards accorded criminal defendants. Those safeguards include the presumption of innocence, the privilege against self-incrimination, the right of cross-examination, proof of guilt beyond a reasonable doubt, and the admissibility of evidence in accordance with the rules of evidence. *In Re: Ruth M. Buehrer et al.,* 50 *N.J.* 501, 516 (1967); *In re Contempt of Ungar,* 160 *N.J.Super.* 322, 332 (App. Div. 1978); *State v. Jones,* 105 *N.J.Super.* 493, 498–499 (Cty. Ct. 1969). However, there is no constitutional right to indictment or trial by jury in every summary criminal contempt proceeding. *In Re: Buehrer, supra,* 50 *N.J.* at 518; *N.J. Dept. of Health v. Roselle, supra,* 34 *N.J.* at 338–339.

This Court has held that a contempt punishable by not more than six months in prison or a fine of $1,000 or both may be prosecuted without indictment or trial by jury. *In Re: Buehrer, supra,* 50 *N.J.* at 522. In reaching that conclusion, Chief Justice Weintraub reasoned that, under the New Jersey and United States Constitutions, there is no right to indictment or trial by jury for petty offenses. He stated that a six months' sentence was not excessive and that it was "debatable" whether a jail term for one year was excessive. *Id.* at 519. He referred to disorderly persons offenses as one type of petty offense and noted that the penalty for a disorderly persons offense was one year in jail or $1,000 or both. *Id.* More recently, the New Jersey Code of Criminal Justice, effective in 1979, established classes of offenses known as disorderly persons offenses and petty disorderly persons offenses, both of which are petty offenses, not crimes. *N.J.S.A.* 2C:1–4. The maximum sentence is six months in jail and $1,000 in the case of a disorderly persons offense or 30 days in jail and a $500 fine in the case of a petty disorderly persons offense. *N.J.S.A.* 2C:43–3, –8.

 Notwithstanding the legislative changes since *Buehrer*, we affirm the conclusion that there is no right to indictment and trial by jury in a summary criminal contempt proceeding where punishment does not exceed six months' imprisonment or a fine of $1,000 or both. We reach that conclusion without setting the "outer limits of punishment". *In Re: Buehrer, supra,* 50 *N.J.* at 519. Since respondent received a fine of $500 without a jail term, he did not have a right to trial by jury in his contempt proceeding. Although not necessary to the preceding result, we note that respondent did not request a jury trial in the proceedings before the trial court, but sought for the first time on appeal reversal on the theory that he had been denied the right to trial by jury.

### III

 Where the conduct of an attorney disrupts the orderliness of a trial, the speed with which a court should respond depends on the offensiveness of the lawyer's conduct and the need to assure the continuity and fairness of the proceeding. *See In re Contempt of Carton, supra,* 48 *N.J.* at 21.

 When the contempt is in the presence of the court, the judge may act summarily without notice or order to show cause. *R.* 1:10–1. On other occasions, the proceedings shall be on notice and on an order for arrest or an order to show cause. *R.* 1:10–2. In addition, the matter may not be heard by the judge allegedly offended, except with the consent of the person charged. *R.* 1:10–4.

The reasons for notice and hearing for a contempt occurring outside the presence of the court "are, first, that there is no need to deal so abruptly with an offense which does not constitute an obstruction within the courtroom itself, and second, that since the court does not know by its own senses all of the facts constituting the offense, there must be a trial to adduce them." *In re Contempt of Carton, supra,* 48 *N.J.* at 22.

That rationale is consistent with a dual test established by the United States Supreme Court to determine the justification for

the exercise of summary contempt powers: (1) the act or omission must occur in the presence of the court so that no further evidence need be adduced for the judge to certify to the observation of the contumacious behavior and (2) the act must impact adversely on the authority of the court. *In re Oliver*, 333 *U.S.* 257, 68 *S.Ct.* 499, 92 *L.Ed.* 682 (1948). *See Cooke v. United States*, 267 *U.S.* 517, 45 *S.Ct.* 390, 69 *L.Ed.* 767 (1925); *Ex Parte Terry*, 128 *U.S.* 289, 9 *S.Ct.* 77, 32 *L.Ed.* 405 (1888).

Both this Court and the United States Supreme Court have demonstrated sensitivity to the potential for abuse in summary contempt proceedings. The United States Supreme Court has stated that summary contempt powers should be limited to the "least possible power adequate to the end proposed." *Harris v. United States*, 382 *U.S.* 162, 165, 86 *S.Ct.* 352, 354, 15 *L.Ed.*2d 240, 242 (1965). That limitation has been followed in New Jersey as well as in federal and other state courts. *N.J. Dept. of Health v. Roselle, supra*, 34 *N.J.* at 343. *See Jessup v. Clark*, 490 *F.*2d 1068 (3d Cir. 1973); *United States v. Delahanty*, 488 *F.*2d 396 (6th Cir. 1973); *United States v. Willett*, 432 *F.*2d 202 (4th Cir. 1970); *Lyons v. Superior Court*, 43 *Cal.*2d 755, 278 *P.*2d 681 (Sup. Ct. 1955); *Peltier v. Peltier, R.I.*, 388 *A.*2d 22 (1978).

Since the power to punish directly inevitably diminishes the procedural due process accorded to the alleged contemnor, the power must be permitted only where necessary. *Harris, supra*, 382 *U.S.* at 165, 86 *S.Ct.* at 354, 15 *L.Ed.*2d at 242. If proof of the contempt depends on evidence from persons other than the judge, the better practice is to proceed on order to show cause even where the contempt is in the face of the court. *Swanson v. Swanson*, 8 *N.J.* 169, 184 (1951). That procedure comports more closely with concepts of procedural due process and eliminates unseemly confrontations between the court and the contemnor. *See, e. g., State ex rel. Wendt v. Journey*, 492 *S. W.*2d 861, 864 (Mo. App. Ct. 1973).

## IV

The critical question is whether an unexcused absence of an attorney should be classified as a direct or indirect contempt

for procedural purposes. The essence of a direct contempt, or contempt in the face of the court, is conduct that a judge can determine through his own senses is offensive and that tends to obstruct the administration of justice. R. Goldfarb, *The Contempt Power* at 68 (Colum. Univ. Press 1963) (Goldfarb). Generally a disruptive act in the presence of the court, such as the use of offensive words or conduct, is a direct contempt. *State v. Gonzalez*, 134 *N.J.Super.* 472, 475 (App. Div. 1975), affirmed in part and mod. in part 69 *N.J.* 397 (1976).

However, an act may be a direct contempt although it is not committed in the presence of the court. *In re Caruba*, 139 *N.J.Eq.* 404, 421 (Ch. 1947), aff'd 140 *N.J.Eq.* 563 (E. & A. 1947), *cert.* den. 335 *U.S.* 846, 69 *S.Ct.* 69, 93 *L.Ed.* 396 (1948). Examples include: threatening letter from an attorney to the clerk in chancery, *In re Jenkinson*, 93 *N.J.Eq.* 545 (Ch. 1922); assault on one incorrectly thought to be a witness, *In re Hand*, 89 *N.J.Eq.* 469 (Ch. 1918); letter from father of husband in divorce proceeding to wife and threats to her attorney, *In re Bowers*, 89 *N.J.Eq.* 307 (Ch. 1918); sending an abusive letter to the ordinary abusing a judge of the probate court, *In re Merrill*, 88 *N.J.Eq.* 261 (Prerog. 1917). More recent examples include: letter from recipient of parking ticket to clerk of municipal court containing obscenities and alleging "ugly" methods of collecting money, *State v. Sax*, 139 *N.J.Super.* 157 (App. Div. 1976), certif. den. 70 *N.J.* 525 (1976); letter to judge from recipient of traffic ticket alleging he would not receive a fair trial, *State v. Gussman*, 34 *N.J.Super.* 408 (App. Div. 1955).

A useful definition of indirect contempt is even more difficult to find. One writer suggests: "Probably the only all-embracing and accurate definition of indirect contempt is that it is composed of all contempts that are not direct." Goldfarb at 70. Stated otherwise, an indirect contempt "is an act committed not in the presence of the court, but at some distance therefrom." *In re Bozorth*, 38 *N.J.Super.* 184, 188–189 (Ch. Div. 1955); *cf. Van Sweringen v. Van Sweringen*, 22 *N.J.* 440 (1956) (by telling a co-respondent in a divorce case that he could obtain a favorable decision for money, an attorney committed

criminal contempt outside presence of the court which reflected on the integrity of judge, who should have disqualified himself).

By itself, the unexplained absence of an attorney from a courtroom is an enigma. It demands an explanation. Aside from the unlikely event of complete disappearance of an attorney, the absence will be followed, as here, by a subsequent appearance before the court. At that time, the court invariably will ask for an explanation from the attorney. Generally, the absence alone does not constitute contempt. An essential element of the offense is the inadequacy of the explanation. *Jessup, supra,* 490 *F.*2d at 1072; *Roselle v. State,* 509 *P.*2d 486, 488 (Okla.Ct.Crim.App.1973). As Justice Traynor has written, "The absence of a valid excuse is an indispensable element of the contempt." *Chula v. Superior Court,* 57 *Cal.*2d 199, 209, 368 *P.*2d 107, 113, 18 *Cal.Rptr.* 507, 513 (Sup.Ct.1962) (dissent).

Although we have not determined when the absence of an attorney is a direct contempt, the Appellate Division has held that an unexplained absence or tardiness together with a refusal to explain or a wholly inadequate excuse will constitute a direct contempt. *In re Clawans,* 69 *N.J.Super.* 373 (App.Div.1961), certif. den. 36 *N.J.* 296 (1962), *cert.* den. 370 *U.S.* 905, 82 *S.Ct.* 1250, 8 *L.Ed.*2d 401 (1962), involved two separate contempts. The first consisted of insulting statements in open court about the trial judge, and the second, which occurred several months later, was a flat refusal to explain her absence. In *State v. Dias,* 76 *N.J.Super.* 337, 340 (App.Div.1962), the defendant-attorney gave a "wholly inadequate excuse" for his tardiness in appearing at a peremptorily scheduled hearing. On appeal, he did not deny that the alleged contempt was one that occurred in the presence of the court.

Federal courts and other state courts have divided on the issue, but the majority view is that an attorney's unexcused absence is not contempt in the actual presence of the court. The rationale is that, although the absence or late arrival of an attorney can be perceived directly by the court, the conclusion that the absence is inexcusable requires reference to facts not

immediately within the court's perception. Among the state courts, *see, e. g., Lee v. Bauer,* 72 *So.*2d 792 (Fla.Sup.Ct.1954) (attorney who sent substitute to pretrial conference should have had an opportunity to explain his reasons for not attending personally); *Peltier, supra* (citing *In re Clawans, supra,* the court held that an attorney who failed to appear committed an indirect contempt); *State v. Winthrop,* 148 *Wash.* 526, 269 *P.* 793 (1928) (reversal of conviction of contempt of attorney whose case was dismissed when he left courtroom for an hour when case was not reached for trial promptly); *Rogers v. Superior Court,* 2 *Ariz.App.* 556, 410 *P.*2d 674 (App.Ct.1966) (attorney's failure to appear because juvenile court attache said attendance was superfluous was an indirect contempt); *People v. McNeil,* 42 *Ill.App.*3d 1036, 1 *Ill.Dec.* 791, 356 *N.E.*2d 1073 (App.Ct.1976) (attorney of record who sent associate to try case was not guilty of even an indirect contempt when the associate went to the wrong courtroom); *People v. Henry,* 25 *Mich.App.* 45, 181 *N.W.* 2d 64 (Ct.App.1970) (attorney who did not appear on date for criminal trial or for oral argument before appellate court was guilty of contempt); *State ex rel. Wendt, supra* (although attorney did not appear after court denied his request for continuance and judge proceeded on order to show cause, judge should have disqualified himself); *Roselle v. State, supra* (tardy appearance of an attorney who was fifteen minutes late is a "hybrid situation" requiring a separate hearing before another judge to determine if defendant was willfully tardy); *contra, Chula, supra* (failure of attorney to appear without sufficient reason constitutes direct contempt); *Lyons, supra* (attorney who was habitually late for proceedings and had been late twice in the trial of the same case guilty of contempt); *Kandel v. State,* 252 *Md.* 668, 250 *A.*2d 853 (Ct.App.1969) (failure of attorney to appear punctually at trial constituted contempt and was properly punished summarily).

As with the state courts, the majority view among the federal courts is to treat the absence of an attorney as an indirect contempt. *See In Re Allis,* 531 *F.*2d 1391 (9th Cir. 1976) (mere absence from courtroom is not contempt); *Jessup, supra* (failure

to appear in federal court due to alleged conflict with state court trial did not require summary punishment); *Delahanty, supra* (attorney's unexplained absence from pretrial conference did not occur in the actual presence of the court so as to justify summary disposition); *see also Willett, supra* (failure to appear as scheduled not a direct contempt); *contra, In Re Gates*, 478 F. 2d 998 (D.C. Cir. 1973) (attorney who failed to appear in the United States District Court because of hearing before magistrate is guilty of contempt); *In Re Niblack*, 476 F.2d 930 (D.C. Cir. 1973) (conviction of contempt sustained against attorney who had been warned frequently about tardiness and appeared two hours late).

We conclude that the mere unexplained absence of an attorney is a hybrid. *Roselle v. State, supra*, 509 P.2d at 488; *Chula, supra*, 368 P.2d at 112. In fashioning the appropriate judicial response, we adhere to our prior declaration that the summary contempt power should be exercised sparingly. *N.J. Dept. of Health v. Roselle, supra*, 34 N.J. at 343. However, we recognize also that strict compliance with the requirement of referring absent attorneys to another judge may not be in the interests of the judiciary, attorneys, or the public. Time would be wasted needlessly if, after observing the absence of an attorney, a judge could not ask, "Where were you?" The answer to that question frequently will obviate the need for further proceedings. Preclusion of the inquiry would prevent any dialogue between court and counsel on an issue that might be resolved without complicated proceedings. The characterization of the contempt as direct or indirect should be deferred until after the attorney has an opportunity to explain his absence.

## V

If there is an adequate explanation, the matter should proceed no further. However, if the attorney refuses to explain, the judge may treat the offense as a direct contempt. *See In re Clawans, supra.* Both the absence and the refusal are in the presence of the judge, who may determine the matter summarily. Similarly if the attorney offers an insulting, frivolous, or

clearly inadequate explanation, both elements of the offense are in the presence of the judge, who may treat the matter as a direct contempt. *See Dias, supra.* Of equal importance the refusal to explain or an offensive explanation creates the need in the court to deal immediately with the matter. *In re Carton, supra,* 48 *N.J.* at 21. The need for immediate adjudication and punishment outweighs the procedural safeguards that would ensue from referring the matter to another judge. In both instances, the attorney has a right to a hearing, albeit before the offended judge. The hearing is limited to proof of facts, legal argument, and the right of allocution. *Id. See In re Logan, Jr.,* 52 *N.J.* 475, 477 (1968) (in a summary contempt proceeding against an attorney for conduct during trial, the attorney should be given an opportunity to dispel any possible misunderstanding or to present exculpatory facts).

If there is some evidence of the adequacy of the explanation, the judge should characterize the matter as an indirect contempt and proceed by order to show cause returnable before another judge. *R.* 1:10-2, -4. The semblance of adequacy dilutes the offensiveness of the explanation and diminishes the need for dealing instantly with the offense. If the proffered explanation may require proof of facts occurring outside the presence of the court, the better practice is to proceed before another judge. Furthermore, referral to another judge eliminates the potential for bias, or at least the appearance of bias. The suggested procedure is consistent with our recent observation that, "In matters involving judicial administration, procedures should be free from even the appearance of unfairness." *In re Court Budget and Court Personnel Essex County,* 81 *N.J.* 494, 497 (1980).

To the extent the inconvenience of the preferred practice unduly encourages some trial judges to hear the matter themselves, the power of the appellate court to make an independent review of the facts and law provides an adequate safeguard for the allegedly contumacious attorney. *See Dias, supra,* 76 *N.J.Super.* at 339; *In re Clawans, supra,* 69 *N.J.Super.* at 378.

The competing interests create a spectrum for selecting the appropriate procedure. The determination of the procedure depends on where the explanation falls on the spectrum. Where the explanation is clearly inadequate, the need to maintain the authority of the court should predominate. The offense should be treated as a direct contempt. Where there is a good faith excuse, although another judge may find it to be inadequate, the predominant consideration should be enhancement of procedural due process for the alleged contemnor. The offense should be treated as an indirect contempt. The explanation and the factual background color the characterization of the offense and affect the determination of the appropriate procedure as well as the ultimate outcome.

Whether the hearing proceeds before the same or another judge, there must be proof of criminal intent to establish contempt as a public offense. As former Chief Justice Weintraub wrote, "[T]he act or omission must be accompanied by a *mens rea*, a wilfullness, an indifference to the court's command." *N.J. Dept. of Health v. Roselle, supra*, 34 *N.J.* at 337; *see In re: William Brown, Jr.*, 50 *N.J.* 435, 437 (1967); *In re Carton, supra*, 48 *N.J.* at 25. Consequently, the offended judge must prove wilfullness by the alleged contemnor, who may present rebuttal evidence.

In this case, the explanation was frivolous. Respondent went to Bermuda in the middle of winter. Whether he went for a vacation, as his daughter stated, or for business, as he asserted, the explanation was clearly inadequate. His unexcused absence was particularly egregious when viewed against the background of a multiple defendant criminal gambling conspiracy case and the admonitions of the trial judge.

There is no evidence of intemperate conduct on the part of the trial judge. Rather, Judge Loftus complied strictly with the requirements of *R.* 1:10–1 *et seq.* and the procedures outlined in this opinion.

Accordingly the judgment of the Appellate Division is reversed, and the judgment of conviction by the trial court and the $500 fine are reinstated.

HANDLER, J., concurring.

I concur in the result reached by the Court in this case. A defense attorney whose unauthorized and unannounced absence from court in the middle of a complicated, multiple-defendant criminal trial is appropriately disciplined under the summary contempt authority of the trial court. *R.* 1:10–1. I write separately to emphasize the point that the contemptuous conduct which occurred here was a direct affront to judicial authority and was most properly punished as a summary contempt.

The offensive conduct occurred during the course of a criminal trial involving ten defendants who were charged with numerous conspiracy and gambling offenses. The trial also involved wiretap evidence. This admixture created especially complex and unusual trial problems. For example, the number of defendants created an obvious potential for conflicts of interest among defense counsel and raised special concerns on the part of the trial judge as to attorney conduct. *Cf. State v. Bellucci,* 81 *N.J.* 531, 544 (1980) (representation of multiple defendants by defense counsel raises ethical conflicts which impact upon an individual defendant's constitutional right to effective assistance of counsel).

Judge Loftus, who presided over the criminal trial, stressed to defense counsel the importance of their commitment to the trial and admonished them as to the urgency of their attendance and punctuality. John W. Yengo, who represented one of the defendants, was fully aware of the judge's instructions to counsel. Nevertheless, on March 2, 1978, he failed to appear at trial without having previously informed the trial judge of his expected absence.

After Yengo's unannounced, unexplained, and unexcused absence from the trial, Judge Loftus made it clear when Yengo subsequently appeared before her that her main grievance concerned Yengo's failure to notify the court of his expected absence. Yengo, however, explained that he had been absent in order to go to Bermuda "[o]n a business venture" for some clients and that until "late Wednesday night [March 1], [he]

hadn't made up [his] mind whether [he] would go [to Bermuda] or come [to the trial on Thursday]." Yengo, who obviously had anticipated being absent, had obtained a substitute attorney, and had advised other defense counsel and his client of his expected absence, was unable to explain his failure either to seek permission of the court for his absence or even to notify the court of his impending or anticipated absence. After giving Yengo a full opportunity to explain this absence and his failure to notify the court, the trial judge then cited him for contempt, a citation which, following the later imposition of a $500 fine, was certified by the trial judge. *R.* 1:10–1.

As I view it, this case involves the inherent contempt power of the judiciary to challenge and to punish affronts to its authority. It has long been recognized that there are occasions when this inherent authority must be exercised both swiftly and summarily in order to ensure obedience to court orders and respect for court procedures. See *In re Oliver*, 333 *U.S.* 257, 274, 68 *S.Ct.* 499, 508, 92 *L.Ed.* 682, 695 (1948); *Cooke v. United States*, 267 *U.S.* 517, 534, 45 *S.Ct.* 390, 394, 69 *L.Ed.* 767, 773 (1925); *Ex parte Terry*, 128 *U.S.* 289, 302–303, 9 *S.Ct.* 77, 79, 32 *L.Ed.* 405, 408 (1888). The summary contempt power is integrally related to judicial self-preservation. *State v. Zarafu*, 35 *N.J.Super.* 177, 182 (App.Div.1955). "The sole credible basis for the summary contempt process is necessity, a need that the assigned role of the judiciary not be frustrated." *In re Fair Lawn Education Ass'n*, 63 *N.J.* 112, 114–115 (1973), *cert.* den. 414 *U.S.* 855, 94 *S.Ct.* 155, 38 *L.Ed.*2d 104 (1973); *McAllister v. McAllister*, 95 *N.J.Super.* 426, 440 (App.Div.1967). This judicial "power is as ancient as the courts to which it is attached and 'as ancient as any other part of the common law.' " *In re Caruba*, 139 *N.J.Eq.* 404, 427 (Ch.1947), aff'd 140 *N.J.Eq.* 563 (E. & A.1947), *cert.* den. 335 *U.S.* 846, 69 *S.Ct.* 69, 93 *L.Ed.* 396 (1948) (quoting *Rex v. Almon*, 97 *Eng.Rep.* 94, 99 (K.B. 1765)).[1]

---

[1] Our rules of court, as well as our statutory law, codify this inherent judicial power. *R.* 1:10–1 provides that "[c]ontempt in the actual presence of a judge may be adjudged summarily by the judge without notice or order to

The summary contempt power operates upon contemptuous conduct occurring "in the actual presence of a judge." *R.* 1:10–1. New Jersey courts have treated the question of what constitutes a contempt in the "actual presence of the court" primarily in terms of the capacity of such conduct to undermine the court's authority and to interfere with or obstruct the orderly administration of justice. *In re Caruba, supra,* 139 *N.J.Eq.* at 411. Ordinarily, contempts of this nature occur directly to and before the judge; hence, the terms "direct contempt" and "contempts *in facie curiae*" are generally used interchangeably. *Id.* at 423. Our courts, however, have never imposed as a prerequisite for a "direct contempt" that every facet of the contemptuous conduct or each element of proof of the contempt be based upon evidential matters occurring only in the actual presence of the judge. To that extent, I disagree with the contrary suggestion of the court. *Ante* at 126. The court in *Caruba,* for example, rejected the argument that false swearing before a master rather than before a judge was not a contempt *in facie curiae.* 139 *N.J.Eq.* at 425. The court stated

"In defining what is meant by 'the presence of the Court,' as that term is used with reference to contempts, it is said that 'the Court' consists not of the judge, the courtroom, the jury, or the jury room individually, but all of these combined. The Court is present wherever any of its constituent parts is engaged in the prosecution of the business of the Court according to law." [*Id.* at 421–422 (citation omitted).]

Similarly, in *State v. Sax,* 139 *N.J.Super.* 157 (App.Div.1976), certif. den. 70 *N.J.* 525 (1976), the court recognized that an act of contempt need not occur in the actual presence of the court or judge so long as it constitutes a direct and immediate affront to judicial authority. In *Sax,* the Appellate Division upheld a contempt conviction of an individual who after having received a parking ticket, had sent to the municipal court clerk a letter

show cause." *N.J.S.A.* 2A:10–1 recognizes that the power of the court to punish for contempt extends to the "[m]isbehavior of any person in the actual presence of the court" as well as "[d]isobedience . . . to any lawful . . command of the courts" and confirms the "inherent jurisdiction of the . . court to punish for contempt." Currently, the New Jersey Code of Criminal Justice preserves the judicial "power to punish for contempt. . . . " *N.J.S.A.* 2C:1–5c.

which contained vulgar language and which charged the court with using "ugly" and coercive methods to get money from the individual. *Id.* at 159. Even though the judge did not initially receive the letter, the judge certified the contents thereof, heard arguments from the letter writer and his attorney, and adjudged the former guilty of contempt *in facie curiae. Ibid.* The court held that such a letter is an act of contempt *in facie curiae* even though the judge may never see or hear it at all. *Id.* at 160. See *State v. Gussman,* 34 *N.J.Super.* 408, 417 (App.Div. 1955).

When the conduct or behavior involves an attorney's courtroom absence, tardiness, or other form of recalcitrance, that conduct may also be treated as a direct contempt in the court's presence if it directly and with some immediacy interferes with the judge's actual exercise of judicial power, offends the authority of the court, and obstructs orderly judicial administration. For example, *In re Clawans,* 69 *N.J.Super.* 373 (App.Div.1961), certif. den. 36 *N.J.* 296 (1962), *cert.* den. 370 *U.S.* 905, 82 *S.Ct.* 1250, 8 *L.Ed.2d* 401 (1962), dealt with an attorney who was convicted summarily of two contempts which involved separate occasions of both tardiness in appearing before the court and a refusal to give adequate reasons for non-appearances, contrary to the court's specific and repeated instructions. The Appellate Division held that both acts of contempt constituted conduct which obstructed or tended to obstruct the course of justice; further, the court specifically held that "Clawans' failure to appear . . . constituted contempt in the face of the court." *Id.* at 381. To the same effect is *State v. Dias,* 76 *N.J.Super.* 337, 340 (App.Div.1962) wherein defendant was punished summarily for contempt upon arriving late for court without a justifiable excuse.

The Court in this case seems too preoccupied by the apparent conundrum that a courtroom "absence" is an ambiguous act and, thus, even though the absence itself necessarily occurs or becomes evident "before the court," its character as a contempt assertedly cannot be ascertained without an "explanation." Embedded in this expression of puzzlement is the unexpressed

assumption that no direct contempts under *R.* 1:10–1 can ever require affirmative proofs other than those which occur directly in the actual presence of the judge. The Court on this point seems to think that unless the contempt in all aspects can be established solely by the judge *qua* eyewitness, it should not be regarded as a "direct contempt" to be dealt with summarily.

If this is the Court's position, it is unrealistic and not in accordance with our case law. In one of our leading cases dealing with the summary contempt power, *In re Carton,* 48 *N.J.* 9, 21 (1966), it was recognized implicitly that a contempt in the court's presence may in some instances involve conduct which has not occurred fully before the court or which requires some incidental, extraneous proofs. If, however, the significant or essential offensive conduct has occurred both before the court and in a manner which directly impacts upon the court's authority and control of the judicial process, then that conduct can be considered and treated as a summary contempt. With respect to any aspects of the offensive conduct which may not have actually taken place in the trial court's actual presence or which may be otherwise unknown to the judge, the Court in *Carton* stated that

[t]he defendant's right to be heard is limited *to the proof of material facts, if any, of which the court may be unaware,* to the legal evaluation of the facts, and to punishment. [*Ibid.* (emphasis added).]

With few exceptions, every contempt calls for an "explanation." Thus, in *In re Logan,* 52 *N.J.* 475, 477 (1968), it was recognized that, even in a summary contempt proceeding against an attorney, the attorney should be informed of the charge and given an opportunity either to dispel any possible "misunderstanding" or to present any exculpatory facts which are unknown to the court.

Every contempt, including those which palpably and frontally assault the senses of the court, demands proof that it was committed by the offender with "criminal intent." See *In re Brown,* 50 *N.J.* 435, 437 (1967); see also *In re Carton, supra,* 48 *N.J.* at 25. As stated in *New Jersey Dep't of Health v. Roselle,* 34 *N.J.* 331, 337 (1961), "[t]he act or omission must be accompa-

nied by a *mens rea*, a willfulness, an indifference to the court's command." No judge, even one who is personally, directly, and unmistakably victimized by a contemnor, is presumed in the context of a criminal proceeding to have the perspicuity to read minds; thus, the judge cannot dispense with proofs of *mens rea* and deny the contemnor the opportunity to present rebuttal evidence concerning intent. It is for this fundamental reason that all persons charged with contempt before the court, no matter how seemingly obvious their guilt, must be accorded the right to present evidence bearing upon the quality of their conduct, including their state of mind. *In re Carton, supra*, 48 *N.J.* at 21. The "explanation" of an unauthorized courtroom absence, which the Court quite properly characterizes as indispensable to establish the contumacious character of the absence (*ante* at 124), is simply to be understood in terms of the issue of *mens rea*. Hence, the usual requirement of proof of intent and the opportunity for the charged party to rebut any normal inferences of a guilty state of mind by offering an "explanation" does not convert an obstructive courtroom absence, which itself has occurred in court and which directly interferes with the court's authority, into some other kind of non-event or innocuous occurrence that mysteriously has taken place somewhere else.

Although this Court talks of a majority position that would regard a courtroom absence as an indirect contempt (*ante* at 124–125), that view has no dominant following. There are several courts which have concluded that this species of contempt, an unexplained and unexcused absence from court contrary to explicit judicial command, is appropriate for summary disposition. *Ante* at 125–126. As already indicated, our own courts have long adhered to this view. *Ante* at 132. Thus, I would not temper or dilute the inherent judicial authority to deal promptly and vigorously with this kind of contemptuous behavior.

The Court expresses genuine concerns prompting it to fashion a rule that would encourage a limitation on the availability of the summary contempt power in situations involving courtroom absences. I do not think a call for judicial timidity is warranted

by what has occurred in this case. To be sure, the summary contempt powers should be used sparingly. See *ante* at 122. In an appropriate case such as this, however, when the summary contempt power is needed to vindicate the authority of the court and to rectify an obstruction of its orderly procedures, it would disserve the cause of justice *not* to invoke that power. With respect to the potential for abuse of the summary contempt power, there are unusually strong safeguards against its arbitrary exercise. In every case, there is the constant responsibility of a judge to disqualify himself or herself for hostility or bias. See *Van Sweringen v. Van Sweringen*, 22 *N.J.* 440, 447–448 (1956). Furthermore, a judge who is confronted with a direct contempt, though not subject to disqualification, nonetheless retains the discretion to deal with that contempt under the more formal procedures of *R.* 1:10–2 and *R.* 1:10–4. *Swanson v. Swanson*, 8 *N.J.* 169, 184 (1951). Most important is the extraordinary scope of judicial review in contempt hearings, constituting a judicial failsafe against not only trial court abuse, but trial court mistakes as well. Our appellate courts—both intermediate and highest—are authorized to make independent determinations of the facts as well as of the law. *State v. Dias, supra*, 76 *N.J.Super.* at 339; *In re Clawans, supra*, 69 *N.J.Super.* at 378; *R.* 2:10–4.

Within the framework of this appeal, the due process concerns voiced by the Court, *ante* at 122, are overstated. The self-evident nature of the contemptuous conduct obviates formal notice and eliminates unfair surprise; the opportunity to be heard and to present proofs and argument, an opportunity available even in summary contempt proceedings, *In re Carton, supra*, 48 *N.J.* at 21, satisfies due process and fairness requirements. See, *e. g., In re Oliver, supra*, 333 *U.S.* at 274–275, 68 *S.Ct.* at 508–509, 92 *L.Ed.* at 694–695; *In re Clawans, supra*, 69 *N.J.Super.* at 381. Here, for example, no one could credibly contend that Yengo was not fully aware that he had disobeyed the court's directives and, further, that when summoned to account, he was caught by surprise and denied a full opportunity to exculpate himself.

In the context of this adjudication, the appellate court should neither denigrate the seriousness of Yengo's contumely nor minimize the obstruction that he created in orderly judicial administration. A trial need not grind to a halt before obstreperous conduct can be regarded as a contemptuous affront to judicial authority. The combination of a purposeful attempt to interfere with the court and intentional acts which have the tendency to obstruct a court is sufficient. *In re Caruba, supra,* 139 *N.J.Eq.* at 411. This unquestionably occurred in this case.

I would not, as the majority seems to do, only haltingly affirm the contempt judgment of the trial court. Judge Loftus, in my estimation, showed commendable skill in the management of a difficult trial and exhibited firmness and fairness in dealing with defense counsel in the course of this trial. The adjudication of Yengo's contempt was in strict conformity with our rules governing summary contempts and was handled by Judge Loftus with poise, patience, and objectivity.

It is entirely appropriate that the Court in this appeal exercise its *de novo* jurisdiction and make an independent finding of guilt. *R.* 2:10–4. An examination of the record should bring the Court unqualifiedly to the same perceptions as the Appellate Division, which stated, "We concur completely with the trial judge's assessment of Yengo's conduct and have no doubt that it was undisputably and egregiously contumacious."

For these reasons, I concur in the result reached by this Court and would reinstate the trial court's judgment of contempt.

PASHMAN, SCHREIBER and HANDLER, JJ., concurring in the result.

*For reversal*—Chief Justice WILENTZ and Justices SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER, HANDLER and POLLOCK—7.

*For affirmance*—None.