848 A.2d 55

IN THE MATTER OF REGINA LYNCH.

IN THE MATTER OF DENISE COBHAM.

Superior Court of New Jersey
Appellate Division

Submitted April 27, 2004—Decided May 17, 2004.

94

Before Judges PRESSLER, ALLEY and R.B. COLEMAN.

*Yvonne Smith Segars,* Public Defender, attorney for appellants (*Jay L. Wilensky,* Assistant Deputy Public Defender, on the brief, for Regina Lynch; *Daniel V. Gautieri,* assistant Deputy Public Defender, on the brief, for Denise Cobham).

Respondent did not file a brief.

The opinion of the court was delivered by

PRESSLER, P.J.A.D. (retired and temporarily assigned on recall).

Appellants in these two appeals, which we consolidate for purposes of this opinion, are public defenders who were assigned to the courtroom of the same trial judge as well as to other trial judges in the county. Each appellant, Regina Lynch in Docket No. A–3146–02T4 and Denise Cobham in Docket No. A–3147–02T4, appeals from a summary contempt order entered against her by that judge imposing a monetary sanction. We reverse both orders finding both of them to be materially deficient both procedurally and substantively.

The undisputed events surrounding these contempt orders began on Friday, January 31, 2003. During the morning session in the trial judge's courtroom, in a colloquy between Lynch and the judge, Lynch advised the judge that she was unaware that the case involving one of her clients had been scheduled for that day. Because of that scheduling, that client had apparently been brought to the courthouse from the jail. The judge assured Lynch that although he had to bring the client into the courtroom, nevertheless "if you're not prepared ... we'll give it a new date."

At some point later in the morning Lynch was called to the courtroom of another judge to whom she was assigned. During her absence, the case of another of her clients was called. The judge noted Lynch's absence on the record and then noting that Cobham was present in the courtroom, the judge proceeded with

the processing of that client in Cobham's presence and over her objection that she did not represent him. Immediately thereafter, the judge called the case of the first client who had been the subject of the judge's assurance to Lynch that a new date would be set. Lynch had not yet returned from the other judge's courtroom. The judge noted her absence, was unimpressed by Cobham's attempt to remind him of the earlier colloquy with Lynch, stated that he had nevertheless not "released" Lynch, held her in contempt, and fined her $75. When Lynch returned to his courtroom and sought to address the contempt holding, the judge said that he would consider it at an appropriate time. There were never, however, any further proceedings.

Before the morning session ended, the judge noted the unexcused absence of one of the male assistant prosecutors assigned to his courtroom but took no action against him. The judge did, however, make a lengthy statement on the record in effect advising that the absence of the public defenders and prosecutors from his courtroom during court sessions without his express permission would result in sanctions against them even if the cause of the absence was an order to appear before a different judge.

During the afternoon session of that Friday, the trial judge expressed to Cobham his general dissatisfaction with the public defender's office handling of violation of probation cases and demanded that Cobham's supervisor appear in his courtroom by 4:30 that afternoon. Cobham attempted to reach him but had to report back to the trial judge that she had been unable to do so. On the following Monday morning, Cobham appeared in the trial judge's courtroom, and the trial judge told her that the case of one of her clients would be heard at 1:30 that afternoon. Cobham responded that she had an appointment with the county's criminal presiding judge at 1:30 p.m. The trial judge nevertheless instructed her to be in his courtroom at that time and said that he would undertake to notify the presiding judge of this instruction by which, we note, the trial judge apparently assumed that his order took priority over that of the presiding judge. The trial judge

could not, however, reach the presiding judge. Uncertain what to do, Cobham consulted her supervisor, who advised her to keep her appointment with the presiding judge, particularly in view of the trial judge's statement the previous Friday in which, in addition to his warnings and instructions to the lawyers, he had made clear that it was the presiding judge who was the authority for resolution of appearance conflicts. Cobham went to the presiding judge's chambers at 1:30 p.m. and she and her supervisor explained the situation to him. By the time the presiding judge was fully informed and called the trial judge to straighten the matter out, the trial judge had already, at 1:35 p.m., held Cobham in contempt because of her unexcused absence and fined her $250. There were no further proceedings and no further hearing on the asserted contempt.

The two separate written contempt orders entered by the trial judge were identical except for the name of adjudicated contemnor and the amount of the fine. Both orders began with the following cryptic recitation:

> This matter being opened on the Court's own motion to determine if sanctions should be imposed pursuant to R. 1:10–1 and/or 1:10–2 on the above named for acting in a contemptuous manner before this court, and for just excuse being offered.

The orders then "ordered and adjudged" that each lawyer ... is sanction[ed]. . . ." followed by a statement of the amount of the sanction and the required date of payment. Both public defenders filed notices of appeal, and the presiding criminal judge stayed both orders pending appeal. The Attorney General has declined to participate in this appeal.

We consider first the procedural deficiencies. That consideration requires us to address briefly the summary contempt scheme provided for by R. 1:10. We start with Chief Justice Weintraub's explication of summary contempt in *N.J. Dept. of Health v. Roselle*, 34 *N.J.* 331, 169 *A.*2d 153 (1961), in which he made clear that, in effect, there is no such thing as civil contempt. Every contempt is criminal or quasi-criminal. The real distinctions are first, whether the contempt will be proceeded with in a summary

manner under the rule or in a plenary manner by indictment or accusation, and second, whether the contempt proceedings are in vindication of the public and judicial interest or in the private interest of a litigant who is harmed or prejudiced by the adverse party's contempt. In implementation of *Roselle,* the Supreme Court adopted *R.R.* 4:87 in 1965, redesignated as *R.* 1:10 in the 1969 rules revision. It was *R.R.* 4:87 which first introduced the tripartite scheme of summary adjudication of contempt, prescribing discrete procedures for (1) contempt in facie curiae, (2) contempt proceedings initiated by order to show cause in all circumstances in which the vindication of the court does not require immediate and peremptory judicial response, and (3) proceedings for private relief brought by a litigant. As originally adopted, *R.R.* 4:87–1 addressed contempt in facie curiae, 4:87–2 addressed proceedings instituted by order to show cause, and *R.R.* 4:87–5 addressed relief to litigants. *R.R.* 4:87–3 and 4:87–4 addressed, respectively, bail and procedures for prosecution and trial when proceedings were initiated by order to show cause. That scheme was preserved in the 1969 revision by designating the original rules as *R.* 1:10–1 to 1:10–5, respectively.

The only significant change in those rules since that time was the 1994 amendment which made both structural and substantive modifications. Structurally, *R.* 1:10–2, –3 and –4 were combined into a single rule with subparts, collecting therein all provisions relating to proceedings initiated by order to show case, resulting in redesignation of relief to litigants as *R.* 1:10–3. The substantive changes were more significant, substantially circumscribing and redefining, as a matter of essential due process, the court's power to adjudicate contempt in facie curiae without the panoply of procedural safeguards that attend the order to show cause proceeding. As made clear in the 1994 Report of the Civil Practice Committee, 136 *N.J.L.J.* 581 (1994), the impetus for those changes was the Supreme Court's opinion in *Matter of Daniels,* 118 *N.J.* 51, 61–62, 570 *A.*2d 416, 422 (1990), in which it held that:

> This extraordinary power, [adjudication of contempt in facie curiae] then, should be exercised sparingly and only in the rarest of circumstances. When an attor-

ney's conduct in the actual presence of the court has the capacity to undermine the court's authority and to interfere with or obstruct the orderly administration of justice, there can be no alternative but that a trial court assume responsibility to maintain order in the courtroom. This narrow exception to due-process requirements permits the imposition of sanctions only for "charges of misconduct, in open court, in the presence of the judge, which disturbs the court's business, where all of the essential elements of the misconduct are under the eye of the court, are actually observed by the court, and where immediate punishment is essential to prevent 'demoralization of the court's authority' before the public."

. . .

Necessity not only justifies the summary contempt power, but also limits that power by defining both settings for its exercise and procedural safeguards. *In re Fair Lawn Educ. Ass'n*, 63 *N.J.* 112, 114–15, 305 *A.*2d 72[, 73–74] (1973). With few exceptions, every contempt calls for an explanation. *In re Logan*, 52 *N.J.* 475, 477, 246 *A.*2d 441[, 442] (1968). Thus, even in summary contempt proceedings against an attorney, the attorney should be informed of the charge and given an opportunity either to dispel any possible misunderstanding or to present any exculpatory facts that are not known to the court. The provision for de novo appellate review of summary contempt convictions is a fail-safe mechanism for assuring that the contempt power is not abused. *In re Yengo, supra,* 84 *N.J.* [111] at 135, 417 *A.*2d 533[, 546–47] (Handler, J., concurring) (judicial appellate review is a "judicial failsafe against not only trial court abuse, but trial court mistakes as well"); see *N.J.S.A.* 2A:10–3; *R.* 2:10–4 (authorizing review on facts as well as law); *see, e.g., In re DeMarco,* 224 *N.J.Super.* 105, 539 *A.*2d 1230 (App.Div.1988) (affirming contempt conviction after consideration de novo with independent findings).

The rule revision, then, following the spirit and instruction of *Daniels,* addressed both the limited circumstances permitting an adjudication in facie curiae and the procedure required to be followed. *R.* 1:10–1, accordingly, was amended to provide in full as follows:

A judge conducting a judicial proceeding may adjudicate contempt summarily without an order to show cause if:

(a) the conduct has obstructed, or if continued would obstruct, the proceeding;

(b) the conduct occurred in the actual presence of the judge, and was actually seen or heard by the judge:

(c) the character of the conduct or its continuation after an appropriate warning unmistakably demonstrates its willfulness;

(d) immediate adjudication is necessary to permit the proceeding to continue in an orderly and proper manner; and

(e) the judge has afforded the alleged contemnor an immediate opportunity to respond.

The order of contempt shall recite the facts and contain a certification by the judge that he or she saw or heard the conduct constituting the contempt and that

the contemnor was willfully contumacious. Punishment may be determined forthwith or deferred. Execution of sentence shall be stayed for five days following imposition and, if an appeal is taken, during the pendency of the appeal, provided, however, that the judge may require bail if reasonably necessary to assure the contemnor's appearance.

The two orders of contempt we are here reviewing disregarded, in their entirety, the procedural requirements of the rule. There was no recitation of the facts, no certification by the trial judge, and, most importantly, no finding that the conduct—the non-appearance in each of the two cases—was willfully contumacious. Beyond that, the reference in the order to *R.* 1:10–1 and *R.* 1:10–2 in the alternative bespeaks the judge's basic misapprehension of the fundamental and critical distinctions between the two rules as a matter of concept, procedure, and essential due process. Obviously, the judge having chosen not to proceed by order to show cause, *R.* 1:10–2 was entirely irrelevant to the matter.

Beyond the procedural deficiencies were the substantive deficiencies. To begin with, we think it is evident from our recitation of the facts that the conduct of neither appellant was willfully contumacious. Lynch had already been assured that a new date would be set for her client, and she had no other matters in the trial judge's court that day. Her consequent non-appearance was hardly, therefore, a flouting of the court's authority. Cobham was instructed by her superior to keep her appointment with the criminal presiding judge which had been arranged before the trial judge unilaterally demanded her presence, in effect, compelling her, if she complied, to disregard her obligation to the trial judge's superior.

In view of the non-appearance basis of the two contempt orders, we are constrained to comment further on the propriety of a facie curiae contempt adjudication for that reason. In *In re Yengo,* 84 *N.J.* 111, 124, 417 *A.2d* 533, 540–41 (1980), *cert. denied,* 449 *U.S.* 1124, 101 *S.Ct.* 941, 67 *L.Ed.*2d 110 (1981), which preceded the 1994 revision, the Supreme Court addressed that circumstance, holding that an attorney's non-appearance when ordered to be in attendance in the courtroom "alone does not constitute

contempt. An essential element of the offense is the inadequacy of the explanation." Thus, as the Court further explicated, it is only "an unexplained absence or tardiness together with a refusal to explain or a wholly inadequate excuse [that] will constitute a direct contempt." *Ibid.* This court followed that holding in *State v. Quintana*, 270 *N.J.Super.* 676, 683, 637 *A.*2d 969, 972–73 (App.Div.1994), which also preceded the 1994 amendment of the rule, emphasizing that non-appearance, as a facie curiae contempt, has two distinct elements, "the absence itself *and* the subsequent refusal to explain it or the patent inadequacy or impropriety of the explanation."

■ We think it plain that because the nonappearance or tardiness cannot be adjudicated as a contempt in facie curiae without the court having first accorded the alleged contemnor an opportunity to explain the absence or lateness, the contumaciousness of the nonappearance is not adjudicable "on the spot" and in the alleged contemnor's absence. And if the conduct itself is not adjudicable "on the spot," it would appear to us there is no basis at all justifying the exercise of the extraordinary facie curiae contempt power. That is to say, the rule only permits the facie curiae adjudication when, among other requirements, "immediate adjudication is necessary to permit the proceeding to continue in an orderly and proper manner...." *R.* 1:10–1(d). If, by definition, the nonappearance is not immediately adjudicable as a contempt and is not so adjudicable until the alleged contemnor has a reasonable opportunity to explain the absence, there is no reason, in terms of maintaining the authority of the court and its ability to proceed, to deprive the alleged contemnor of the procedural due process attendant upon a contempt proceeding pursuant to *R.* 1:10–2.

■ Indeed, in this regard, the 1994 Report of the Civil Practice Committee, Appendix A, suggested that at least one of the purposes of the proposed rule revision was the overruling of *Yengo* and the concomitant imposition of the requirement that *R.* 1:10–2 ordinarily be the recourse for failure of appearance. As the

Committee pointed out, after noting the necessity of the opportunity of the alleged contemnor to explain the absence, "there is no apparent reason why Mr. Yengo ... could not have been adjudicated in contempt by an order to show cause proceeding. We understand moreover that the Court in *Daniels* suggests the desirability of a more limited definitional scope of in facie curiae contempt and the attendancy of appropriate procedural safeguards when peremptory judicial response is not required," and, we add, when peremptory response cannot accomplish the purpose of permitting the proceeding in progress to continue. We are consequently satisfied that if an in facie curiae adjudication is not impelled by conduct obstructing the proceeding in progress and is not required in order for the proceeding to continue in an orderly and proper manner, then resort to the facie curiae power is interdicted by the rule.

We fully understand the tension resulting from the frustration of trial judges who must move their calendars and, on the other hand, the demanding schedules of overworked public defenders and prosecutors who, under present circumstances, often cannot avoid conflicting obligations. They are all under strain and pressure. We do not believe, however, that that tension can be productively resolved by peremptory ultimata from the court and sanctions imposed on lawyers who are trying to do their jobs in difficult situations. It behooves all participants in the court system, and particularly the judges and lawyers, to understand that they are not adversaries and to cooperate in attempting to reach their mutual objective of advancing the work of the criminal justice system.

The contempt orders appealed from are reversed.