212 N.J. Super. 284 (1986)
514 A.2d 1335
IN THE MATTER OF BARBARA R. LEPENDORF CHARGED WITH CONTEMPT OF COURT.
Superior Court of New Jersey, Appellate Division.
Argued July 28, 1986.
Decided September 10, 1986.
*285 Before Judges HAVEY and SKILLMAN.
Theodore V. Fishman argued the cause for appellant Barbara R. Lependorf (Thomas S. Smith, Jr., Acting Public Defender, attorney; Theodore Fishman, of counsel and on the brief, and Susan Abraham, Assistant Deputy Public Defender, on the brief).
Debra L. Stone, Deputy Attorney General, argued the cause for respondent State of New Jersey (W. Cary Edwards, Attorney General of New Jersey, attorney).
The opinion of the court was delivered by SKILLMAN, J.A.D.
This is an appeal from an order holding defense counsel in a capital murder case in contempt for failing to provide the court and prosecutor with the names of prospective defense witnesses within the time required by the pretrial order. We conclude *286 that the trial judge should not have summarily adjudicated the alleged contempt pursuant to R. 1:10-1 but rather should have referred the matter to another judge for a hearing pursuant to R. 1:10-2 and 4. Therefore, we reverse and remand.
The pretrial conference in the murder case was held on June 7, 1985. Paragraph 4 of the pretrial order provided:
The state has supplied a witness list. Defendants will supply a list of witnesses on or before July 12, 1985. All parties to abide by the Rules of Discovery in adding names to their witness lists. (Guilt phase only)
Defense counsel, Barbara R. Lependorf, the respondent in contempt proceedings, failed to submit a list of witnesses by July 12, 1985 or by the beginning of the trial.
On October 17, 1985, at the beginning of the third day of jury selection, Lependorf advised the trial judge she had "a potential defense witness list" consisting of five names. The trial judge asked her why these names had not been produced earlier. Lependorf responded that two of the witnesses had been interviewed by her investigator only the day before and that the others still had not been interviewed. Lependorf further stated that she had been aware of one of the names on the witness list earlier but that there had been only the "vaguest of possibilities" the person would testify. She said that "until my investigator has seen somebody, it's not even a potential witness, as far as I'm concerned...."
The trial judge stated that he did not consider this to be an excuse for failing to disclose the witnesses' names earlier and that he was considering holding her in contempt. The following colloquy then occurred:
THE COURT: There's never any need to only place witnesses who are actually going to be called. As you well know possible witnesses is what the Court asks for, and what you're fully aware.
MS. LEPENDORF: Judge, if I told you the number of names that I had, it would have been, I mean, almost ridiculous. And we've tracked them down, one by one, we have one investigator assigned to us who has every murder case in our office, including the death penalty cases. He has been working day and night. He hadn't reached, I mean there were a lot of people that were not listed as witnesses, and won't be listed as witnesses, because there are people who had no information. But we had a list of names that was huge, and by the *287 time he reached each one, if it was a potential witness, and as I said, at this point, he hasn't even talked to Albert Crawford, or Mr. Mindy.
THE COURT: Well, he hadn't talked to them a week ago either. You could have given us the names then, could you not have?
MS. LEPENDORF: Judge, as I said, I could have given you a list of maybe 50 or 60 names, but they would have been worthless.
THE COURT: What would have been wrong with that, that's actually what I had asked you for, all possible witnesses. And you continued to maintain you had no witnesses on many occasions. I can recall very distinctly before the time, or at the time we were going over the questionnaire, Mr. Norris getting up and specifically asking you, and you telling this Court that you had no witnesses, and you knew your responsibilities.
MS. LEPENDORF: That's true.
THE COURT: Anything further as to it?
MS. LEPENDORF: I think you and I define a potential witness differently, Judge, that's all I can say.
There was then a discussion between the court and counsel concerning possible prejudice to the State from the late disclosure of potential witnesses. Recesses were taken during which telephone calls were placed to at least two of the witnesses. As a result, the prosecutor advised the court that the persons named as potential witnesses by the defense would give testimony of only marginal relevancy. Accordingly, he did not seek either to bar their testimony or to adjourn the trial.
The trial judge resumed consideration at this point of whether Lependorf should be held in contempt. Lependorf responded by recounting a series of failures by the prosecutor to comply with pretrial orders. With respect to her own alleged failure to produce a timely list of potential witnesses, she said:
I do not consider a potential witness until that person has been interviewed. As I said, I have at least 50, 60 names that I could have given to the Court, which would have been ridiculous. They did not "pan out" as witnesses. I've given names that weren't even interviewed, Mr. Norris knew more about Mr. Myndyllo, or whatever his name is, than I did. But because the names have now narrowed down, I thought it was appropriate to give all of the names that we had left. I am not saying this in defense, if that's the appropriate term, of rule, whatever the rule is that the Court quoted, because I'm not even addressing myself to that issue, I don't know what my rights are under that.
The trial judge then held Lependorf in contempt and imposed a fine of $200. He explained the reasons for this action as follows:

*288 As far as this Court is concerned, and as far as I believe all parties are aware, we are not talking about those witnesses that will be called, but possible witnesses. I find that at least one of the persons on that list, and probably many more than one, were known by Ms. Lependorf to have been possible witnesses in this case. I don't base that on the fact that she had an interview with any one of them, but that there was within her mind, the understanding that one or more of those persons would have been listed as witnesses, and she did not provide them to the Court.
....
I find this to be a contemptuous act on the part of Ms. Lependorf to intentionally not give this Court the names of possible witnesses, if not sooner, certainly as of last Thursday or Friday.
After the criminal trial, Lependorf filed a motion to dismiss the order of contempt and vacate sanctions. The basis for the motion was that the contempt should not have been summarily adjudicated by the trial judge but rather should have been referred to another judge for a hearing after the conclusion of the murder case. This motion was denied on January 3, 1986.
On appeal Lependorf argues that the trial court erred in summarily adjudicating her guilty of contempt pursuant to R. 1:10-1. This rule provides that "[c]ontempt in the actual presence of a judge may be adjudged summarily by the judge without notice...." "This authority to deal instanter with an offense so committed arises from necessity, to support the judge's control of the courtroom." In re Contempt of Carton, 48 N.J. 9, 21 (1966). Rule 1:10-2 provides that "[e]very other summary proceeding to punish for contempt shall be on notice, ..." and R. 1:10-4 provides that in a proceeding under R. 1:10-2 "[e]xcept with the consent of the person charged, the matter may not be heard by the judge allegedly offended or whose order was allegedly contemned."
The Supreme Court's most recent discussion of the circumstances in which a court may summarily adjudicate a contempt pursuant to R. 1:10-1 is contained in In re Yengo, 84 N.J. 111 (1980), cert. den. 449 U.S. 1124, 101 S.Ct. 941, 67 L.Ed.2d 110 (1981), which involved an attorney who was absent from court for several days during a criminal trial in which he was representing one of multiple defendants. The Court observed that *289 "[t]he essence of a direct contempt, or contempt in the face of the court [which would fall within R. 1:10-1], is conduct that a judge can determine through his own senses is offensive and that tends to obstruct the administration of justice." 84 N.J. at 123. However, the Court also observed that there are some circumstances in which "an act may be a direct contempt although it is not committed in the presence of the court." Ibid. It concluded that the absence of an attorney from court proceedings is in some circumstances a direct contempt which can be summarily adjudicated by the judge hearing the case pursuant to R. 1:10-1 and in other circumstances an indirect contempt which should be referred to another judge for hearing:
We conclude that the mere unexplained absence of an attorney is a hybrid. In fashioning the appropriate judicial response, we adhere to our prior declaration that the summary contempt power should be exercised sparingly. However, we recognize also that strict compliance with the requirement of referring absent attorneys to another judge may not be in the interests of the judiciary, attorneys, or the public. Time would be wasted needlessly if, after observing the absence of an attorney, a judge could not ask, "Where were you?" The answer to that question frequently will obviate the need for further proceedings. Preclusion of the inquiry would prevent any dialogue between court and counsel on an issue that might be resolved without complicated proceedings. The characterization of the contempt as direct or indirect should be deferred until after the attorney has an opportunity to explain his absence.
....
If there is an adequate explanation, the matter should proceed no further. However, if the attorney refuses to explain, the judge may treat the offense as a direct contempt. Both the absence and the refusal are in the presence of the judge, who may determine the matter summarily. Similarly if the attorney offers an insulting, frivolous, or clearly inadequate explanation, both elements of the offense are in the presence of the judge, who may treat the matter as a direct contempt. Of equal importance the refusal to explain or an offensive explanation creates the need in the court to deal immediately with the matter.
....
If there is some evidence of the adequacy of the explanation, the judge should characterize the matter as an indirect contempt and proceed by order to show cause returnable before another judge. R. 1:10-2, -4. The semblance of adequacy dilutes the offensiveness of the explanation and diminishes the need for dealing instantly with the offense. [84 N.J. at 126-127; citations omitted].
Thus, the trial judge under Yengo must hear an attorney's explanation, if any, for his failure to appear in court and may *290 summarily adjudicate the contempt only if the explanation is "insulting, frivolous, or clearly inadequate." On the other hand, if there is some "semblance of adequacy" to the explanation, the contempt proceedings must be heard before another judge.
A trial attorney's late submission of a witness list is comparable to the failure to appear in court for the purpose of determining whether a trial judge may summarily adjudicate contempt proceedings. The late submission of a witness list, like a failure to appear in court, occurs in the immediate presence of the court. However, any explanation for that late submission, like an explanation for a failure to appear in court, may require proof of facts that occurred outside the presence of the court. Furthermore, in both types of alleged contempt, the semblance of adequacy of an attorney's explanation for his or her actions "diminishes the need for dealing instantly with the offense." In re Yengo, supra, 84 N.J. at 127; cf. In re Hinsinger, 180 N.J. Super. 491, 495-497 (App.Div. 1981).
Lependorf's explanation for her late submission of a witness list was not "insulting, frivolous or clearly inadequate" but rather had some "semblance of adequacy" and hence the trial judge should have referred the contempt proceedings against her to another judge for hearing. Lependorf indicated that she did not understand the pretrial order to require her to list the name of every person who had come to her attention as possibly having information favorable to her client. Rather, her understanding was that the obligation only arose when she had confirmed by interview or other means that a person probably had information helpful to her client and hence was reasonably likely to be called as a witness for defendant. Lependorf further indicated that she had not reached that point with respect to any person on her witness list until the time when the list was produced.
It is unclear from the record whether Lependorf was held in contempt because the trial judge broadly interpreted her obligation *291 to produce a list of witnesses to include every person whose name had come to her attention as a possible witness or because he made a factual finding that she knew for some time before submitting the list that one or more persons were likely to be called as defense witnesses. At one point the trial judge seemed to indicate that Lependorf should have supplied the names of all of the 50 to 60 persons who had come to her attention as possible witnesses, even if no interview or other investigation had been conducted to confirm that any of those persons had information helpful to the defendant. On the other hand, at other points the trial judge seemed to indicate that he was satisfied Lependorf had determined at least a week before trial that one or more persons were likely to be called as defense witnesses. We conclude that a summary adjudication of contempt pursuant to R. 1:10-1 was not warranted on either basis.
We do not read the pretrial order in this case as imposing an obligation upon Lependorf to provide the prosecution and the court with the name of every person who had come to her attention as a possible defense witness. The order simply required defendant to "supply a list of witnesses." This requirement should be read in light of R. 3:13-3(b)(3), which provides for production of the names of "persons known to defendant whom he may call as a witness at trial...." R. 3:13-3(b)(3) does not limit a defendant's required witness list to persons who will definitely be called as witnesses. However, it cannot reasonably be read to require the listing of the name of every person who has come to the attention of the defendant or defense counsel as possibly having information favorable to defendant, even if the information possessed by that person has not been confirmed by interview or other means.
Indeed, if R. 3:13-3(b)(3) were read to require a defendant to disclose the name of possible witnesses before it was determined whether the information possessed by those persons was exculpatory in nature, serious constitutional problems might arise. Although a criminal defendant may be required to *292 disclose the names of prospective defense witnesses in advance of trial, see Williams v. Florida, 399 U.S. 78, 80-86, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970); State v. Montague, 55 N.J. 387, 394-403 (1970), it would violate a defendant's right to the effective assistance of counsel and/or his privilege against self-incrimination to compel his attorney or him to disclose the names of witnesses who possess information which is inculpatory, see State v. Williams, 80 N.J. 472, 477-481 (1979); State v. Mingo, 77 N.J. 576, 581-587 (1978); State v. Kociolek, 23 N.J. 400, 412-417 (1957); see also Annot., "Right of Prosecution to Discovery of Case-Related Notes, Statements, and Reports  State Cases," 23 A.L.R.4th 799 (1983). The practical problem for defense counsel is that before the information possessed by a person has been determined, it cannot be known whether his or her testimony will be exculpatory or inculpatory. Therefore, we conclude that the pretrial order did not require Lependorf to list as a witness any person whose name had come to her attention when the nature of the information possessed by that person had not yet been confirmed by interview or other means.
Lependorf could be held in contempt if she is shown to have known one or more persons who were likely to be called as a defense witnesses but failed to disclose their names to the prosecutor and the court. Several statements made by Lependorf during the summary contempt proceeding suggested that she knew of certain defense witnesses before disclosing their identity on the third day of jury selection. However, at other points in the proceedings she denied having such knowledge. The trial judge should not have undertaken to resolve the ostensible inconsistencies between different statements made by Lependorf. Rather, he should have recognized that her denial of knowledge of any defense witnesses provided at least a semblance of an explanation for her failure to submit a witness list earlier and required referral of the alleged contempt to another judge. In re Yengo, supra, 84 N.J. at 127.
We note that because the contempt was adjudicated summarily Lependorf had no opportunity to present witnesses. Furthermore, *293 perhaps because she was surprised by the sudden initiation of contempt proceedings against her, Lependorf's own statements were vague and somewhat disjointed. A plenary hearing before another judge will provide Lependorf with the opportunity to present the testimony of witnesses such as investigators from the Public Defender's office and to state with specificity what knowledge she had before jury selection of the identity of the persons included in her witness list.
Another reason the order of contempt must be reversed is that under the circumstances of this case any adjudication of contempt should have been postponed until after the criminal trial had been completed. In In re Contempt of Ungar, 160 N.J. Super. 322 (App.Div. 1978), this court observed:
It is often useful to postpone disposition of a contempt charge against an attorney arising during trial until the primary trial itself has ended. When, as here, the misconduct is not likely to repeat itself, withholding immediate action has much in its favor. A deliberate course encourages a more dispassionate evaluation of the incident. Also, it is less likely to interfere with the attorney's first obligation, the assiduous representation of his client. [160 N.J. Super. at 333; citations omitted].
These comments apply with particular force to an attorney who has undertaken the awesome responsibility of representing a defendant in a capital case. We further note that Lependorf's counsel stated at oral argument that her obligations under the attorney-client privilege may have prevented her from presenting a more satisfactory explanation of why the witness list was not submitted sooner. This suggests that, as is frequently the case, defendant himself may have been a source of information about potential defense witnesses, and that Lependorf may have understandably felt that, in defending herself from contempt, she could not disclose what her client had said to her and when. Since the criminal trial has now been concluded,[1] Lependorf may no longer be subject to the same constraints or, if she is, it may be possible to secure a waiver from the client of any rights he may have under the attorney-client privilege.
*294 We make one final observation. The defense witnesses in a criminal case should of course be disclosed before commencement of jury selection and in some instances, as required by the pretrial order in this case, substantially in advance of trial. Therefore, we do not condone the late submission of the witness list in this case.[2] However, there are a number of possible explanations for that late submission other than the contempt of defense counsel, such as delay by investigators in the Public Defender's office in completing their investigation or by defendant in advising his attorney of possible defense witnesses. A full hearing will provide an opportunity to determine what responsibility, if any, Lependorf bears for the late submission of that list and whether her acts constituted a contempt of court.
Accordingly, the order of contempt is reversed and the matter is remanded for a hearing pursuant to R. 1:10-2 and 4.
NOTES
[1] We were advised at oral argument that the criminal trial resulted in a conviction for murder but that the death penalty was not imposed.
[2] We note that in some circumstances sanctions may be imposed pursuant to R. 1:2-4 upon a party or an attorney for conduct which causes a delay in trial proceedings. Since the proceedings against Lependorf were for contempt of court, there is no occasion for us to determine whether, or under what circumstances, sanctions may be imposed pursuant to R. 1:2-4 for late submission of a witness list even if that conduct does not constitute contempt of court.