270 N.J. Super. 676 (1994)
637 A.2d 969
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
BARBARA QUINTANA, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted December 7, 1993.
Decided March 11, 1994.
*677 Before Judges PRESSLER, BROCHIN and KLEINER.
*678 Zulima V. Farber, Public Defender, attorney for appellant (Jay L. Wilensky, Assistant Deputy Public Defender, of counsel and on the letter brief).
Robert W. Gluck, Middlesex County Prosecutor, attorney for respondent (Simon Louis Rosenbach, Assistant Prosecutor, of counsel and on the letter brief).
The opinion of the court was delivered by PRESSLER, P.J.A.D.
Defendant Barbara Quintana appeals from an order summarily adjudicating her in contempt in the presence of the court because of her nonappearance for sentencing on minor criminal charges to which she had pleaded guilty pursuant to a plea negotiation limiting her sentence to a probationary term. We are satisfied that the contempt order was improvidently entered, and we accordingly reverse.
In view of our obligation to review summary convictions for contempt de novo, R. 2:10-4, we find the following facts from the record before us. A two-count accusation was returned against defendant charging that on January 23, 1991, she and one Sophie Mercado had engaged in a third-degree conspiracy to commit burglary and theft and that on the same day, defendant had committed a third-degree burglary. Defendant was arrested on that day and, unable to post bail, remained incarcerated in the Middlesex County jail until February 13, 1991, when she waived indictment, pleaded guilty to both charges, and was released on her own recognizance.
Prior to the plea proceeding, defendant had entered into a plea negotiation with the State resulting in an agreement whereby the State, in exchange for the guilty plea, agreed to recommend a probationary term subject to time served. This was her first indictable offense, she was then twenty-five years old, had not completed high school, had sporadic employment and irregular living arrangements, and was a drug abuser. According to the *679 factual basis for the charge given by her at the plea proceeding, her friend Mercado suggested that they go to an apartment in New Brunswick to commit a burglary and theft. Defendant waited on the sidewalk while Mercado gained entry to the apartment by breaking a window and took some items of personal property, which she apparently then handed to defendant. Defendant was arrested shortly thereafter in a grocery store with the stolen property still in her possession. The victim advised the authorities that all his stolen property had been returned undamaged and that he was seeking restitution in the amount of $80 to pay for the broken window.
At the conclusion of the plea proceeding, the judge directed defendant's release on her own recognizance conditioned upon her appearing for sentencing. No date for sentencing was then set. According to the probation report, defendant's "place of residency has been short term and sporadic." Prior to the commission of this crime she had lived with a cousin in New Brunswick for several months and before that with a boyfriend, also in New Brunswick. Upon her release, she gave an address in Milltown as her mailing address but did not state with whom she was living and did not give a telephone number. It does not appear that she was asked if there was a telephone number at which she could be reached.
Sentencing was fixed for June 24, 1991, four and a half months after entry of the plea. Defendant did not appear. The record is silent as to how prior notice was given or was attempted to be given to her of that date. Nor is there anything in the record indicating what efforts, if any, the public defender assigned to represent her had made to locate her and to give her notice. Consequently, there is nothing in the record to support the factual conclusion that defendant actually had notice of the sentencing date. In any event, as a result of her nonappearance, a bench warrant for her arrest was issued. The warrant was executed on February 12, 1992. The record does not indicate the place of execution or where defendant was then residing. In any event, *680 she was then again incarcerated in the Middlesex County jail from which she was released on March 18, 1992, after posting bail in the amount of $5,000. The record gives no indication as to why she was not sentenced on the original guilty plea either on her arrest or at any time during her ensuing 36-day incarceration. Nor, inexplicably, does the record contain the slightest clue as to what, if anything, defendant was told upon her release as to when and where the sentencing would take place. Nor does it indicate what information was then elicited from her, if any, respecting her place of residence. All we do know is that sentencing was scheduled for May 19, 1992, two months following her release. Again the record is completely silent in respect of the notice given or attempted to be given defendant of that date. Again she did not appear.
Following defendant's second nonappearance, another bench warrant was issued pursuant to which she was arrested on July 27, 1992. Again the record is silent as to its place of execution or defendant's then residence. This time, she was unable to post bail, which had been set at $25,000, and consequently remained incarcerated for another twenty-nine days. On August 24, 1992, she was finally brought before the court for sentencing on the original charges. By that time she had been incarcerated for a total of eighty-seven days on what was to be a probationary term subject to time served of twenty-two days. At the sentencing hearing a two-year probationary term was imposed on the original guilty pleas subject to the now eighty-seven days of time served. Drug-abuse rehabilitation conditions were imposed together with an $80 restitution order. At the same time, defendant also pleaded guilty to a new charge of fourth-degree criminal trespass, the sentence for which was concurrent to the probationary term. An aggregate Violent Crimes Compensation Board penalty of $90 was imposed.
Defendant does not appeal from any of these dispositions. She appeals from the sentencing judge's decision at the sentencing hearing to adjudicate her in contempt in facie curiae on the basis *681 of her two prior nonappearances at sentencing and the imposition of a $50 fine.
With respect to the proceedings that preceded the adjudication, the record shows that at the start of the hearing, the judge addressed defendant directly and asked her why she had not appeared on the two prior sentencing dates. The following colloquy ensued:
THE DEFENDANT: Well, your Honor, because I was at  at the time I was moved. I had moved from one address to another address. I move a lot. So I was having problems with my ex-boyfriend. So I left him. And I went 
THE COURT: Did you inform the Court that you moved?
THE DEFENDANT: Did I inform the Court?
THE COURT: H-mm.
THE DEFENDANT: No. Because I don't have steady place where I was staying.
THE COURT: Where do you live now?
THE DEFENDANT: Now I'm staying at 88 Remsen Avenue.
THE COURT: Mr. Matlaga represented you a couple months ago. I recall specifically that when you didn't appear for your sentencing, I didn't issue a warrant for a week because I didn't want to do that on a noncustodial recommendation. What happened during the week they tried to find you to bring you in here?
THE DEFENDANT: Mr. Matlaga you say?
THE COURT: H-mm.
THE DEFENDANT: He couldn't get in touch with me. I had called him and I tried to  he  I left him notes in his  I went to the office and left him notes and stuff. He just  we could never run into each other just like we couldn't run into each other before.
THE COURT: Your address now for the record is? What's your address now for the record?
THE DEFENDANT: 88 Remsen Avenue. Stay there with my friends.
At that point, the judge went on to take defendant's guilty plea to the fourth-degree criminal trespass charge.
Thereafter, following the judge's imposition of sentence on the three criminal charges, the prosecutor requested that defendant "be made to pay a fine for her contempt in that it was twice that she failed to appear. And once may be forgiven, but twice the State would ask for a fine to be imposed." This was the first mention of contempt at any time in the proceedings. Defense counsel objected on the ground that no formal contempt charge *682 against defendant had been made. The judge, citing In re Yengo, 84 N.J. 111, 417 A.2d 533 (1980), cert. denied, 449 U.S. 1124, 101 S.Ct. 941, 67 L.Ed.2d 110 (1981), responded that there didn't "have to be a formal contempt charge. It's contempt in the face of the Court." He then forthwith announced that he was holding defendant in contempt, explaining to defense counsel that defendant had "created that problem because she neglected her obligation to keep you or the Court advised of her address." The $50 fine was then imposed as part of the judgment of conviction of the crimes charged, the judgment providing in full in this regard as follows: "Contempt of court fine $50.00 to be paid within sixty (60) days." There was no separate order adjudicating the contempt and no written certification by the judge of the facts constituting the elements of the adjudicated contempt.
We are satisfied that the adjudication was both procedurally and substantively defective. R. 1:10-1, governing contempt in facie curiae, permits the offended judge in whose actual presence the contempt was committed to adjudicate it forthwith without the notice or order to show cause otherwise required by R. 1:10-2 and without the procedural protections of R. 1:10-3 and -4.[1] The rule further requires that the "order of contempt shall recite the facts and contain a certification by the judge that he saw or heard the conduct constituting the contempt." Not only were such an order and certification not entered here, but it is also clear that there *683 were, as a matter of law, insufficient facts of record to have warranted such an order.
With respect to the substantive issues, the ultimate question we must address is whether a criminal defendant's nonappearance at a scheduled court proceeding is conduct susceptible to adjudication as contempt in facie curiae. We are aware that in In re Yengo, the Supreme Court addressed the issue of nonappearance in the context of an attorney's failure to comply with a direct order to be in court at a time certain. We are, however, satisfied that the trial judge read Yengo far too broadly in the circumstances here. To begin with, the Court in Yengo recognized that the essence of contempt in facie curiae and that which distinguishes it from other contempts is the court's knowledge, based on its own senses, of all the facts constituting the offense. Moreover the offense must be one constituting an obstruction within the courtroom itself. If there is no obstruction, then there is no need to deal so abruptly with the offense, and if the court does not by its own perceptions know all of the facts, then there must be a trial to adduce and adjudicate them. 84 N.J. at 121, 417 A.2d 533. Acknowledging that its holding rejected the majority view of both the state and federal courts, id. at 124-126, 417 A.2d 533, the Court nevertheless reasoned that an attorney's nonappearance could constitute a contempt in facie curiae but only if the attorney, when finally appearing before that judge, either refuses to give an explanation for the nonappearance or "offers an insulting, frivolous, or clearly inadequate explanation...." Id. at 126-127, 417 A.2d 533. In that event, the Court concluded, "both elements of the offense are in the presence of the judge, who may treat the matter as a direct contempt." Id. at 127, 417 A.2d 533. We understand these elements to be the absence itself and the subsequent refusal to explain it or the patent inadequacy or impropriety of the explanation. Thus, as the Court made clear, "mere unexplained absence of an attorney" is insufficient to constitute a contempt in facie curiae. It does not warrant the *684 characterization as a direct or indirect contempt until the attorney has been accorded the opportunity to explain the absence.
Even if we were to assume that a defendant's nonappearance were subject to the same contempt consequences as those prescribed by Yengo for attorneys, we think it plain that the required elements for an in facie curiae adjudication were missing here. Before we even consider the two elements of the offense that engaged the Court in Yengo, we must address that element common to all contempts, that is, the wilfulness of the conduct whether it be wilful noncompliance with a court order or wilful misbehavior in the courtroom. Obviously, this defendant's nonappearance at sentencing cannot be deemed wilful if she was neither actually notified of the sentencing date nor ordered to keep either the court or the Probation Department advised of her changes of address. As the United States Supreme Court made clear in Green v. United States, 356 U.S. 165, 78 S.Ct. 632, 2 L.Ed.2d 672 (1958), in reviewing a summary contempt conviction based on failure to surrender for execution of sentence, a finding reasonably based on the evidence that defendants had knowledge of their specific obligation to appear and hence that their failure to do so was wilful was an absolute prerequisite to the validity of the conviction. This record does not permit a finding of fact either that defendant had the requisite notice of the sentencing date or that her failure to receive notice was the result of her noncompliance with any order of the court. Nor indeed was any such finding made beyond the judge's observation that defendant herself was responsible for the problem because she had neglected her obligation to keep her attorney or the court advised of her address, an obligation which the record does not indicate defendant was ever made aware of. We do not suggest that defendant's failure to appear may not have been wilful. The point, of course, is that there were no facts adduced permitting the finding that it was wilful and no certification by the trial judge that he knew by the evidence of his own senses that it was wilful. R. 1:10-1 was, therefore, clearly misapplied.
*685 Beyond that, it is clear that the adjudication here, contrary to the principles of Yengo, was based only on defendant's nonappearance without any real consideration by the court of the sufficiency of her excuse. Moreover, we also think it plain in view of the facts we have recited respecting defendant's reasons for her nonappearance and in view of the statements she made at the hearing that her explanation was not patently "insulting, frivolous, or clearly inadequate...." A hearing to adduce the facts underlying the charged contempt was therefore necessary, precluding its disposition as a direct contempt.
We have further reservations regarding the direct contempt proceeding here. We note that the contempt prosecution in Green v. United States was prosecuted not as a contempt in the presence of the court pursuant to Fed.R.Crim.Proc. 42(a), the federal analogue to R. 1:10-1, but as an indirect contempt requiring notice and hearing pursuant to Fed.R.Crim.Proc. 42(b), the federal analogue to R. 1:10-2. Our own research has failed to disclose any federal case in which an alleged contempt based on a bail jumping type of offense was prosecuted as a direct contempt. We are, moreover, persuaded that the far better practice is to prosecute such contempts under R. 1:10-2 as indirect contempts, and we see nothing in Yengo, which expressly deals only with attorney nonappearance, to preclude that requirement. In this regard, we note that attorney nonappearance does not constitute a crime other than contempt. Bail jumping by a defendant, however, does. See N.J.S.A. 2C:29-7, which also expressly preserves the court's power to punish that conduct for contempt. Because the conduct is otherwise criminal, the summary contempt conviction may have significantly greater collateral consequences to a defendant than a similar conviction of an attorney who misses a court appearance. For this reason, the procedural protections of an indirect summary contempt prosecution should be accorded, particularly since the alleged contemptuous conduct does not constitute obstructive misbehavior requiring immediate court response in order to maintain the integrity of the courtroom, the *686 authority of the court, or the ability of a matter in progress to proceed in an orderly manner.
We make one final observation. As the Supreme Court pointed out in In re Daniels, 118 N.J. 51, 61, 570 A.2d 416, cert. denied, 498 U.S. 951, 111 S.Ct. 371, 112 L.Ed.2d 333 (1990), the judicial power summarily to adjudicate and punish contempts in facie curiae runs counter to our basic precepts of procedural due process by denying the accused a trial and subjecting him to adjudication by his accuser. While that power may be justified to protect the integrity and legitimacy of the judicial process, it is nevertheless clear that this "extraordinary power, then, should be exercised sparingly and only in the rarest of circumstances." Ibid. We do not believe that bail jumping ordinarily constitutes that rare circumstance. Both the criminal statute and a contempt proceeding on notice and order to show cause are available to deal equally effectively with that conduct. Beyond that, we are of the view that the highest degree of judicial circumspection must inform the decision to exercise the direct contempt power and that it should not be exercised unless mandated by the overriding and urgent interests of fundamental protection of the judicial process. We see no need for the power to have been exercised here. Defendant had already been incarcerated for a total of sixty-five days solely because of her nonappearance. She had obviously already paid the price for it. If more was deemed necessary, other recourse, attended by procedural due process, was available.
That portion of the judgment convicting defendant of contempt and imposing a fine therefor is vacated. The judgment is otherwise affirmed.
NOTES
[1] As we understand the law of contempt, prosecution under both R. 1:10-1 and 1:10-2 is summary, as opposed to prosecution for the indictable offense of contempt initiated by indictment or accusation. We are aware that from time to time in this and other jurisdictions, the use of the term "summary contempt proceedings" has been intended to denote forthwith adjudications of contempt in the presence of the court. We regard that usage as too limited since the distinction, as we see it, between all proceedings under R. 1:10 and all other contempt prosecutions is indictment and the ensuing plenary criminal process, including the right to trial by jury. Thus both R. 1:10-1 and 1:10-2 proceedings are summary. R. 1:10-1 proceedings are summary proceedings without prior notice, process or the procedural protections of R. 1:10-3 and 1:10-4. See generally N.J. Dept. of Health v. Roselle, 34 N.J. 331, 169 A.2d 153 (1961).