718 A.2d 244

IN THE MATTER OF CONTEMPT CITATION AGAINST DUANE, MORRIS & HECKSCHER LLP, A PENNSYLVANIA LIMITED LIABILITY PARTNERSHIP, APPELLANT.

STATE OF NEW JERSEY, PLAINTIFF, v. CRUZ CONSTRUCTION COMPANY, INC., CRUZ CONSTRUCTION CORPORATION, WHITMAN, REQUARDT & ASSOCIATES, ET AL., DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued March 31, 1998—Decided July 14, 1998.

Before Judges LONG, STERN and KLEINER.

*Frank A. Luchak,* argued the cause for appellant (*Duane, Morris & Heckscher, LLP,* attorneys; *Mr. Luchak* and *Wayne J. Martorelli,* of counsel and on the briefs).

*John F. Neary,* argued the cause for respondent Cruz Construction Corp. as successor to Cruz Construction Company, Inc. (*Connell, Foley & Geiser,* attorneys; *Mr. Neary,* of counsel and on the brief).

*Lawrence P. Powers,* argued the cause for respondents Whitman, Requardt & Associates, Kenneth H. McCord, Frederick R. Knoop, Jr., H. Hudson Myers, William A. DeLoache, Edward A. Serp, James A. Avirett, Jr., John S. Maynes, Charles R. Lortz, Thomas J. Shafer (*Hill Wallack,* attorneys; *Mr. Powers,* of counsel; *Mr. Powers* and *Steven W. Griegel,* on the brief).

The opinion of the court was delivered by

STERN, J.A.D.

Appellant, Duane Morris & Heckscher ("DMH"), appeals from a portion of an "ORDER: RE: MOTION FOR SANCTIONS" entered on May 19, 1997 requiring it to "pay a sanction to the Clerk of the Superior Court ... Law Division ... in the amount of $5,000 ...." The order, obtained on defendants' application, also provided, among other things, that "[a] determination of any evidence exclusion as a result of the matters raised on the defendant's joint motion for sanctions shall be the subject of an evidentiary hearing to be scheduled at a later date, should the defendants wish to seek such relief." It also considered certain reports received by DMH as an answer to defendant Whitman, Requardt & Associates' interrogatory number 25 and considered the reports to embody "adoptive admissions."

The only issue before us relates to the monetary sanction, which the parties consider an adjudication of contempt appealable as of

right. We were not asked to grant leave to appeal to consider the merits of the Law Division's rulings as to any of the discovery issues. In any event, it is clear that the monetary sanction was not imposed under *R.* 1:10–3, in aid of litigant's rights, because the monetary sanction was payable to the Clerk of the Superior Court, not a party, and was not based on the party's costs or prejudice. In fact, the question of "prejudice" was reserved for later determination.

Irrespective of what sanctions could have been imposed, we hold that the "contempt" resulting in the $5,000 sanction did not occur in the presence of the court and was not punishable summarily under *R.* 1:10–1. Accordingly, we reverse its imposition.

The action which underlies this appeal is detailed in *State v. Cruz Const. Co. Inc.*, 279 *N.J.Super.* 241, 243, 652 *A.*2d 741 (App.Div.1995). In February 1993 the State commenced this action against Cruz Construction Co. Inc. and Cruz Construction Corporation (collectively "Cruz"), Safeco Insurance Company of America ("Safeco"), Whitman Requardt Associates, Inc. ("WRA") and others. Cruz and the State entered into a contract on October 10, 1975, under which Cruz was to construct a reservoir pipeline 3.6 miles in length linking the North Dam of the Round Valley Reservoir in Clifton to a release structure located in Whitehouse Station. In 1977, Cruz completed its work under the contract with the State.

"On June 15, 1988, a section of the pipeline installed by Cruz ruptured, resulting in the discharge of a claimed 40 million gallons of water and requiring closure of the pipeline until repairs could be completed." *Ibid.* The State alleged that Cruz breached its contract by constructing the pipeline with defective materials which failed to conform to contract specifications. *Ibid.* Defendants' motion to dismiss the complaint was denied by the Law Division and, pursuant to leave granted, we affirmed. *Id.* at 243–44, 652 *A.*2d 741.

The background leading to the May 19, 1997 order now before us is not in dispute. A Case Management Order dated September 3, 1996, confirmed prior rulings by providing that:

1. On or before August 30, 1996, plaintiff shall provide to defendants:

   a. Responsive answers to all interrogatories served by all defendants not previously answered.

   b. Al[l] test data and investigative reports respecting the rupture of the [pipeline], the cause thereof and alleged defects therein.

. . .

   d. A fair and candid statement of the basis upon which plaintiff claims each defendant is liable to it for the damages alleged, including, without limitation, identification of each expert upon whom plaintiff relies for any such claim, and a summary of the opinions of each such expert to the extent presently available. Plaintiff will be permitted to revise or amplify its statement if necessary by reason of new information revealed in discovery.

2. Plaintiff shall complete all of its factual discovery including depositions of all fact witnesses during the months of September, October, and November 1996.

. . .

4. Plaintiff shall provide defendants with final experts' reports on the issues of liability and damages on or before January 2, 1997.[1]

[(Footnote added).]

On or about August 30, 1996, the State served its "INITIAL STATEMENT OF THE BASIS FOR ITS CLAIMS AGAINST DEFENDANTS." The document did not comply with the August 30 deadline that it identify each expert who was expected to support each of the claims and provide a summary of each of the experts' opinions.[2]

---

[1] We are told that "the deadline for service of the State's expert reports was extended to February 21, 1997. Expert reports were duly served in advance of that date."

[2] DMH says that: "The Preliminary Statement did not identify any expert witnesses for good reason. At the time, the consultants who were ultimately to be identified as the State's expert witnesses were only beginning their analysis of the documents and evidence in this technically complex construction litigation. The State thus had not elected whether it would use those persons as its expert

According to defendants, in October 1996, while defendants' motions to compel more specific answers to interrogatories and to compel compliance with the September 3, 1996 order were pending, the State's experts (Schultz and Lewis), *"unbeknownst to the Court and defense counsel* ... conduct[ed] an extensive walkthrough inspection of the inside of the pipeline during which they allegedly made videotaped observations of cracking and conducted unrecorded 'soundings.'" Unaware that such activity occurred, on November 8, 1996, the court heard defendants' motion to enforce the September 3, 1996 order and warned counsel about the need to comply with the discovery orders.[3] The judge specifically indicated he would impose a "sanction" against either party "if I start to conclude ... they're stonewalling and [demonstrating a] lack of good faith."

The court's confirming order of November 22, 1996 required the State to provide answers or more specific answers to several enumerated interrogatories. However, the State was not required to produce expert reports until January 31, 1997, provided that "[u]nderlying facts ... shall be disclosed" immediately. Moreover, the order expressly provided that the "State of New Jersey shall comply fully with the terms of the Case Management Order dated September 3, 1996 by *immediately* providing or making available to all defense counsel" certain designated material. The order concluded by warning that "[c]ounsel are advised that unauthorized deviation from this Court's discovery and case management orders may result in the imposition of sanctions."

The State submitted "Supplemental Responses" to WRA's interrogatories on or about December 4, 1996. It called interrogatory

witnesses at time of trial, and had no experts which it could identify, nor had it requested or received expert opinions from those persons."

[3] We note that because there was no certification for the summary contempt, the judge did not certify that his action was based on any misrepresentation to the judge on November 8, 1996 or at any other time. Nor did the judge so find on May 2, 1997.

11 "burdensome" in response to the request for "all persons who inspected the pipeline" "and the results of the inspection" and "all documents which reflect the result of each inspection." The State nevertheless listed the entities or persons conducting inspections. In response to Interrogatory No. 25, regarding expert witnesses, the State elaborated upon its objection to discovery of information regarding consultants and experts who were not expected to testify at trial.[4] In any event, the State disclosed the identity of its experts on or about December 23, 1996.

On or about February 24, 1997, the State produced two expert reports, including a report prepared by Schultz Engineering, the State's liability expert, which described various theories of liability against Cruz and WRA. According to defendants, they

> were shocked to discover that [the report] was based, *in large part*, upon evidence *covertly* gathered by DMH's experts in October 1996. Upon realizing this, defendants ... promptly filed motions seeking sanctions ... [and] barring the use by the State of the data gathered by these activities.
>
> [ (Citations omitted).]

On May 2, 1997, the trial court heard argument on defendants' motions for sanctions. The hearing went as follows:

> MS. PAIGE [COUNSEL FOR WRA]: As we indicated in our original motion, the pieces of pipe from the ... rupture in 1988 have largely vanished. There are a few pieces of concrete left and there are a few pieces of the cylinder. ... These components were of great concern from the very beginning [and] we asked for those [pieces] informally. ...
>
> Now ... the question of the October excavation ... was done with no notice to any of the parties. ...
>
> THE COURT: It was a failure to accurately disclose an express interrogatory answer of what had in fact been undertaken at that time that was answered. ...

---

4 The answer incorporated the answer to question 24 and said:

   The State objects to this interrogatory to the extent that it calls for disclosure of the opinions of persons whom the State does not intend to call as trial experts, on the ground that such disclosure is not required under the New Jersey Court Rules. Subject to the foregoing objection, the State responds that the subject matter of this interrogatory will be addressed in the State's expert report, which is to be provided on or before January 31, 1997, per the current Order of the Court.

MR. NEARY [COUNSEL FOR CRUZ]: Once [the State] decide[s] to go out and start gathering evidence, start doing destructive sampling, in my view it made no difference whether he was a testifying expert, nontestifying expert. ... Once he starts tampering with evidence ... we had to be there. We had to have notice and we had to know exactly what was going to be done so that we could object, not object ... Clearly[,] we don't need an order for that. ...

MR. LUCHAK [COUNSEL FOR PLAINTIFF]: I represent the State ...

With regard to the 1988 rupture, there's no evidence that those experts were anything more than consultants who were retained by the State to assist the State in determining the cause of problems. ...

THE COURT: Let's get back to ... the crux of this. How could we possibly in the context of this case and the concern and the need for disclosure and trying to get this back on track to identify liability, how could the state possible undertake something of this scope ... it was clearly surreptitious, the dark of night that you went in and did that.

MR. LUCHAK: I agree the answer [to defendant's interrogatory No. 11] was not literally candid. ...

THE COURT: Literally candid. I have another one but that's a very loyal phrase for it.

...

How can you erroneously answer an interrogatory that asks for inspections? ...

MR. LUCHAK: Your Honor ... the information sought by this interrogatory is the subject of expert opinion which shall be provided as such time as it is established ... by the Court for the production of expert reports. ...

The interrogatory was not ... asking about inspection ... by experts. We made it clear that we were carving out an area that we were not providing there could or would be expert inspection performed on the pipe. ...

THE COURT: So it is conceded this was an expert that was embarking on this unilateral excavation investigation, whether he was going to be used or not, may, as I understand your position, have been up in the air at that point?

MR. LUCHAK: That's correct, your Honor. He was an expert ... [but][w]e had not decided if we were going to use him as a trial expert to testify and for that reason, we didn't feel we had to divulge information concerning that.

THE COURT: But didn't the destructive testing give you some thoughts?

MR. LUCHAK: Well ... it did not because an equal sample was retained. The entire pipeline was and is available.... There's been no certification presented that said this has caused us prejudice because what you have done has prevented us—

THE COURT: ... That I concede is maybe the subject of technical dispute and we'll have a hearing on that.

The trial judge thereafter concluded:

This case has been conferenced on several occasions by the Court. I have made the observation and continue to make the observation, although I've tried to deal with it informally as well as formally, that I felt that the State was being less than aggressive in providing appropriate discovery to defendants. In my view I've attempted to accommodate the State along the way and afforded them opportunities to complete expert reports which have never been explained to my satisfaction ...

...

I then have an Interrogatory Number 11 that has been propounded: Identify all persons who inspected the pipeline ... and as to each person identified ... [identify] the purpose for which the inspection was made. ...

Incredibly answers served by plaintiff ... did not disclose, however, that in fact extensive inspections of the pipe had taken place literally just weeks before—namely in October of 1996. ...

This court had entered previous orders requiring the disclosure of experts. Consistent with what I find to be the plaintiff's continuing dilatory tactics, they attempted to justify all this behavior by suggesting that this is while they had not decided whether this expert would be used or not.

Consequently, I am going to impose sanctions against the plaintiffs in this case, Duane Morris, in the amount of $5,000 for these egregious violations of both the letter and spirit of ... this Court's orders.

In a contempt case, we must generally review the record and make a *de novo* determination. *See N.J.S.A.* 2A:10–3; *R.* 2:10–4; *In Re: Buehrer,* 50 *N.J.* 501, 515–16, 236 *A.*2d 592 (1967); *Canino v. D.R.C., Co.,* 212 *N.J.Super.* 620, 624, 515 *A.*2d 1267 (App.Div. 1986); *see also In re Yengo,* 84 *N.J.* 111, 127, 417 *A.*2d 533 (1980) (referring to "the power of the appellate court to make an independent review of the facts and [the] law [to] provide an adequate safeguard for the allegedly contumacious attorney"), *cert. denied,* 449 *U.S.* 1124, 101 *S.Ct.* 941, 67 *L. Ed.*2d 110 (1981). Here, however, we need decide only whether, even if the facts are as alleged by defendants, a summary contempt could be imposed against their adverse counsel.[5]

---

[5] If this was, in fact, a contempt other than under *R.* 1:10–1, it should be prosecuted under *R.* 1:10–2(c) by the Attorney General or County Prosecutor,

■ Defendants contend that the sanction can be upheld pursuant to *R.* 4:23-2(b)(4) which provides, in relevant part, that if a party:

fails to obey an order to provide or permit discovery, ... the court in which the action is pending may make such orders in regard to the failure as are just, *[including]* ... *an order treating as a contempt of court the failure to obey any orders* [, and] ... the court shall require the party failing to obey the order to pay the reasonable expenses ... caused by the failure ....

However, we have held that an order issued under the court's inherent contempt of court powers must comply with the procedures set forth in *R.* 1:10. *Canino, supra,* 212 *N.J.Super.* at 622, 515 *A.*2d 1267. While the reach of the summary contempt powers of *R.* 1:10-1 was amended in 1994, we adhere to *Canino* and believe that, absent an admission to the judge of inexcusable or willful non-compliance or what may be deemed a "direct" contempt in the actual presence of the court, *see R.* 1:10-1(a) through (e) in the conjunctive, compliance with *R.* 1:10-2 is required. *See also State v. Quintana,* 270 *N.J.Super.* 676, 637 *A.*2d 969 (App.Div. 1994); Pressler, *Current N.J. Court Rules,* comment 2 on *R.* 1:10-1 (1998) (the 1994 revision adopted a "more highly restrictive substantive and procedural definition of the in facie curiae power").

■ *R.* 1:10-1 provides:

A judge conducting a judicial proceeding may adjudicate contempt summarily without an order to show cause if:

(a) the conduct has obstructed, or if continued would obstruct, the proceeding;

(b) the conduct occurred *in the actual presence of the judge, and was actually seen or heard by the judge;*

(c) the character of the conduct or its continuation after an appropriate warning *unmistakably demonstrates its willfulness;*

---

and in either case on appeal by the Attorney General or County Prosecutor. *Cf. State v. Storm,* 141 *N.J.* 245, 661 *A.*2d 790 (1995). The presence of counsel for adverse parties suggests a proceeding under *R.* 1:10-3 for relief to that litigant which, as we have already noted, has been reserved. Clearly *R.* 1:10-2 was not implemented in the case in the absence of both a prosecutor and prior notice, and note that a *R.* 1:10-3 "Relief to Litigant" proceeding can be tried with a *R.* 1:10-2(a) proceeding "only with the consent of all parties [including the State] and subject to the provisions of *R.* 1:10-2(c)." *See R.* 1:10-2.

(d) immediate adjudication is necessary to permit the proceeding to continue in an orderly and proper manner; *and*

(e) the judge has afforded the alleged contemnor an immediate opportunity to respond.

*The order of contempt shall recite the facts and contain a certification by the judge that he or she saw or heard the conduct constituting the contempt and that the contemnor was willfully contumacious. . . .*

[ (Emphasis added).]

The order in this case did not so comply, and "an adjudication without the required recitation and certification is fatally defective." Pressler, *supra,* comment 2 on *R.* 1:10–1. In any event, this case did not involve a "direct" contempt or improper conduct in the actual presence of the court.

As Justice Pollock wrote in *In re Yengo,* 84 *N.J.* 111, 417 *A.*2d 533 (1980):

The characterization of the contempt as direct or indirect should be deferred until after the attorney has an opportunity to explain his absence. If there is an adequate explanation, the matter should proceed no further. However, if the attorney refuses to explain, the judge may treat the offense as a direct contempt. . . . Similarly, *if the attorney offers an insulting, frivolous, or clearly inadequate explanation, both elements of the offense are in the presence of the judge, who may treat the matter as a direct contempt. Of equal importance the refusal to explain or an offensive explanation creates the need in court to deal immediately with the matter.* The need for immediate adjudication and punishment outweighs the procedural safeguards that would ensue from referring the matter to another judge.

. . .

*If there is some evidence of the adequacy of the explanation, the judge should characterize the matter as an indirect contempt and proceed by order to show cause. . . . The semblance of adequacy dilutes the offensiveness of the explanation and diminishes the need for dealing instantly with the offense.* If the proffered explanation may require proof of facts occurring outside the presence of the court, the better practice is to proceed before another judge. . . .

The competing interests create a spectrum for selecting the appropriate procedure. The determination of the procedure depends on where the explanation falls on the spectrum. *Where the explanation is clearly inadequate, the need to maintain the authority of the court should predominate.* The offense should be treated as a direct contempt. Where there is a good faith excuse, although another judge may find it to be inadequate, the predominant consideration should be enhancement of procedural due process for the alleged contemnor. The offense should be treated as an indirect contempt. The explanation and the factual

background color the characterization of the offense and affect the determination of
the appropriate procedure as well as the ultimate outcome.
[*Id.* at 126–28, 417 *A*.2d 533 (citations omitted).]

Applying these principles to the situation before it, the Court in
*Yengo* concluded that an attorney's explanation as to why he went
to Bermuda in the middle of trial and in violation of a court order
requiring his presence was "frivolous" and sustained a summary
contempt adjudication. *Id.* at 128, 417 *A*.2d 533.

Because this case does not involve an attorney's conduct in court
or lack of appearance as directed, *Yengo* is distinguishable, and we
need not explore the fact that "the amended rule appears to
supersede *In re Yengo.*" Pressler, *supra*, comment 2 on *R.* 1:10–
1. The other analogous cases decided before the 1994 amend-
ments support DMH's position.

In *Canino*, we reviewed an order adjudicating an attorney in
contempt for failure to comply with a discovery order to testify at
a deposition and imposing a $1,000 fine. 212 *N.J.Super.* at 622–23,
515 *A*.2d 1267. As here, a motion for sanctions under *R.* 4:23–
2(b)(4) was filed. In reversing the trial judge's imposition of a
sanction for contempt, we held that "such an order may [not] be
issued under the court's inherent powers without complying with
the procedures set forth in *R.* 1:10–1, *et seq.*," *id.* at 622, 515 *A*.2d
1267, and directed any further proceedings to be brought under *R.*
1:10–2. *Id.* at 624, 515 *A*.2d 1267.

Similarly, in *In re Lependorf*, 212 *N.J.Super.* 284, 285, 514 *A*.2d
1335 (App.Div.1986), we reviewed a trial court's order summarily
adjudicating defense counsel in contempt for her failure to timely
disclose the names of witnesses. We determined that the trial
judge should not have summarily adjudicated the alleged contempt
pursuant to *R.* 1:10–1 but rather should have referred the matter
to another judge for a hearing pursuant to *R.* 1:10–2 and –4, after
the criminal proceedings were concluded. *Id.* at 286, 514 *A*.2d
1335. Distinguishing the case from *Yengo, supra,* Judge Skillman
stated:

A trial attorney's late submission of a witness list is comparable to the failure to
appear in court for the purpose of determining whether a trial judge may

summarily adjudicate contempt proceedings. The late submission of a witness list, like a failure to appear in court, occurs in the immediate presence of the court. However, any explanation for that late submission, like an explanation for a failure to appear in court, may require proof of facts that occurred outside the presence of the court.

[*Id.* at 290, 514 *A*.2d 1335.]

We considered Ms. Lependorf's explanation that she did not understand the court order to require her to list the name of every person who had come to her attention as possibly having information favorable to her client, and concluded that her explanation for the late submission of a witness list was not " 'insulting, frivolous or clearly inadequate.' " *Ibid.* We found the explanation had some " 'semblance of adequacy' " requiring reference of the contempt proceedings to another judge for issuance of an order to show cause. *Ibid.*

Likewise, in *State v. Quintana,* 270 *N.J.Super.* at 683–84, 637 *A*.2d 969, we held that a criminal defendant's non-appearance at scheduled court proceedings is not conduct susceptible to adjudication as a contempt *in facie curiae.* We further concluded that, even if it was, the defendant's reasons for her non-appearance were "not patently 'insulting, frivolous or clearly inadequate' " and warranted a hearing to adduce the facts underlying the charged contempt. *Id.* at 685, 637 *A*.2d 969. We thus reversed the trial court's imposition of a $50 sanction. *Id.* at 686, 637 *A*.2d 969.

DMH argues that the record does not support a finding that there was a "willful or even [an] inadvertent violation of the court's order ... [and] there has been no evidence of injury or prejudice to the defendants as a result of the alleged acts of plaintiff."

Interrogatory number 11 asked the State to "[i]dentify all persons who inspected the pipeline ... on behalf of the plaintiff ..." In October 1996 "extensive inspections of the pipe" had been made but DMH failed to inform their adversary of that occurrence. DMH argues that there is "nothing in the rules governing discovery which can be reasonably understood to require counsel for a party to identify a retained technical consultant as an expert

witness who will testify at trial, before that consultant has con-
cluded his investigation," and that the "Court Rules draw a clear
distinction between opinions of experts expected to testify at trial,
which are plainly discoverable ... and opinions of experts not
expected to testify, which are discoverable only upon a showing of
'exceptional circumstances.'" DMH contends that "until a consul-
tant is designated as an expert expected to testify [that] disclosure
of the identities or investigations conducted by that consultant is
not required, absent a showing of compelling circumstances by the
adverse party." The consultant is considered by DMH to be part
of the attorney's work product. DMH explained to the judge its
view that experts need not be identified until a party decides
whether to use them:[6]

> Your Honor ... the information sought by this interrogatory is the subject of
> expert opinion which shall be provided a[t] such time as it is established ... by the
> Court for the production of expert reports. ...
>
> The interrogatory was not ... asking about inspection ... by experts. We
> made it clear that we were carving out an area that we were not providing there
> could or would be expert inspection performed on the pipe.

We believe that DMH's legal position warranted serious consider-
ation, although there is no excuse for the false or misleading
answers originally given. Plaintiff's contention should have been
raised in a more timely fashion. But counsel was neither impolite
nor "insulting" in the presence of the judge. Rather, counsel
candidly admitted that his answer to defendant's interrogatory
No. 11 "was not literally candid."

We do not decide whether the trial judge could compel counsel
to identify a consultant who is not going to be retained as an
expert or whether there was a discovery order violation. We hold
only counsel's conduct warranted plenary consideration in light of
the explanation given and the manner in which it was presented.
Nor do we approve of the conduct of the State's attorneys, and
believe that there are methods, including those permitted by *R.*
1:10–2 and *R.* 1:10–3, for imposing sanctions based on their willful

---

[6] We address the issue in this context only with respect to whether the question
of willfulness warranted a plenary hearing.

non-compliance with the court's orders if that non-compliance is to be found willful.

We applaud the efforts of the trial judge to move the case, but believe the monetary sanction was imposed without recognition of procedural prerequisites. Certainly, defendants should not be prejudiced by the State's conduct, and they may be entitled to sanctions and relief under *R.* 4:23–2, *R.* 1:10–3, or otherwise. *See Canino, supra,* 212 *N.J.Super.* at 623–24, 515 *A.*2d 1267. The judge expressly gave them the right to pursue that route, and they agree that the $5,000 sanction payable to the Clerk of the Superior Court, Law Division, was not geared to their costs.

Our disposition makes it unnecessary to consider whether a $5,000 sanction can be summarily imposed without the right to a jury trial.

As the proceedings did not comply with *R.* 1:10, the order under review is reversed.